# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 22-477V**

* * * * * * * * * * * * * * * * * * * * * * * * *
PATRICIA STEWART-ROBINSON, *
Petitioner, *
v. *
SECRETARY OF HEALTH AND HUMAN SERVICES *
Respondent. *
* * * * * * * * * * * * * * * * * * * * * * * * *

Chief Special Master Corcoran

Filed: September 3, 2026

*Renee J. Gentry,* The Law Office of Renee J. Gentry, Washington, DC, for Petitioner.

*Alexa Roggenkamp,* U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION ON REMAND[1]

On April 28, 2022, Patricia Stewart-Robinson filed a petition for compensation under the National Vaccine Injury Compensation Program (the "Program").[2] She alleges that an influenza ("flu") vaccine that she received on September 25, 2019, caused her to develop what was eventually diagnosed as multiple sclerosis ("MS")—although her initial presentation was suggestive of another injury, transverse myelitis ("TM") of the spinal cord.

I originally denied entitlement (without permitting Petitioner the opportunity to file an expert report), based on the conclusion that Petitioner's actual injury was MS; that I had repeatedly rejected causation theories that MS is an adverse event associated with vaccination; and that it was not likely Petitioner could identify new medical or scientific evidence supporting a causal

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

association of any kind between the flu vaccine and MS. And I gave low weight to the fact that Petitioner presented with what *appeared* to be TM, since her ultimate diagnosis was still MS. Petitioner successfully obtained review of that Decision, however, and the matter was remanded to me to permit further expert development. *See* Order, dated Sept. 20, 2024 (ECF No. 51) (the "Remand Order").

The parties have now filed expert reports, plus additional briefs in support of their respective positions. Petitioner's Motion for Ruling on the Record, dated Oct. 29, 2025 (ECF No. 66) ("Mot."); Respondent's Opposition, dated Dec. 29, 2025 (ECF No. 67) ("Opp."); Petitioner's Reply, dated Jan. 19, 2026 (ECF No. 69) ("Reply"). In the course of briefing the claim, Petitioner has clarified her contentions—acknowledging that she was properly diagnosed with MS (even if initially her symptoms "predominantly" presented as TM), but arguing that the MS was "a continuation of the significant aggravation of her TM," based upon the agreed-upon fact that pre-vaccination she likely possessed "asymptomatic spinal cord lesions." Mot. at 12, 13, 16. In effect, she now asserts a claim of significant aggravation of MS (although she continues to focus on the TM presentation as meaningful for purposes of causation).

For the reasons set forth below, I deny entitlement. Even after obtaining an expert report, Petitioner's causation theory remains unreliable and not preponderantly established. Petitioner's expert opinion sets forth a causation theory highly similar to one I recently reviewed in a parallel case also involving the flu vaccine and MS, but it has been no more persuasively advanced than before. Overall, the record does not support the conclusion that it is likely the flu vaccine can aggravate MS—and the fact that Petitioner's MS presented with spinal cord myelitis (a common occurrence in MS) does not alter this conclusion.

## I. Factual Background

Petitioner's prior medical history was significant for anemia, gastroesophageal reflux disorder, epigastric pain, and gastric bypass surgery. Ex. 6 at 32; *see also* Exs. 10 and 16. Of note, she was briefly hospitalized in January 2017 for fatigue and dizziness, which was attributed to her anemia. *See* Ex. 10 at 182–255. And a year prior to vaccination, she received treatment for reported pain to the touch on the left side of the head. Ex. 16 at 8. However, it does not appear Petitioner experienced any pre-vaccination clinically-observed neurologic events.

*Vaccination and October 2019 Hospitalization*

On September 25, 2019, Petitioner (who was 53 at the time) received the flu vaccine at an appointment with Linke Ma, M.D., her primary care provider ("PCP"). Ex. 3 at 2. She was also at this time treated for iron deficiency anemia and vitamin D deficiency. *Id.* There is no medical record evidence of any close-in-time reaction to this vaccination.

Almost three weeks later, on October 13, 2019, Petitioner saw Munif Hussain, D.O., now complaining of paresthesia and tingling in both legs that began seven days prior (meaning October 6, 2019—eleven days after vaccination), but that was lasting all day. Ex. 4 at 5. She also reported that she did not feel the sensation of urinating at times, and had difficulty sensing her rectum when wiping. *Id.* at 5–6. She denied back pain, fever, headache, weakness, recent trauma or illness, or abdominal pain, however. *Id.* at 5. On examination, Petitioner displayed decreased sensation below her knees and lower back, as well as decreased strength in both lower legs, although reflexes were present and normal. *Id.* at 5–6. Dr. Hussain sent her to an emergency department ("ED") for additional evaluation. *Id.* at 6.

That same day, Ms. Stewart-Robinson went to the Brooklyn Hospital Center. Ex. 5 at 12. She informed emergency care treaters that she had for three days (meaning since October 10, 2019) been experiencing bilateral numbness from the waist down plus chills, night sweats, fever, difficulty walking, neck pain, and pain in her legs that she rated five out of ten. *Id*. at 2, 12. She also identified the vaccination as when she had started to experience changes in how she felt, noting specifically that in the three prior days she had felt ascending changes in sensation in her lower extremities that progressed to numbness. *Id*. at 12. Consistent with her examination by Dr. Hussain, examination at the ED revealed decreased sensation in Petitioner's lower extremities, but normal sensation to her abdomen, back, face, and upper extremities. *Id*. at 12–13. She also denied pain and difficulty walking, but admitted to difficulty sensing the position of her feet. *Id*. at 14. At the time of her admission, serologic blood testing revealed a lowered white blood cell count and an elevated monocyte level (thereby reflecting "monocytosis").[3] *Id.* at 271.

Petitioner remained hospitalized until October 20, 2019. Ex. 5 at 32. MRIs performed of the cervical spine in this timeframe revealed a mild T2 prolongation measuring six by five by two-and-a-half millimeters at the base of the odontoid process, a second slight T2 prolongation measuring four millimeters at the mid-C3 level, and a third slight T2 prolongation in the lower cervical and upper thoracic cord—all of which were deemed suggestive of the presence of a mild demyelinating disorder (although only the prolongation seen at C1-C2 showed enhancement—meaning it was likely a newer/active lesion).[4] *Id*. at 108, 217. Thoracic spine MRIs taken the same

[3] Monocytosis is a blood test finding applicable to testing results where an individual's monocyte count rises above a normal range. *Monocytosis*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=31969 (last visited Sept. 3, 2026). Its presence suggests immune system activation, which can be attributable to a number of causes (an infection, active inflammation, etc.).

[4] In an MS patient, the use of enhancement in imaging can reveal the presence of new lesions (as opposed to old lesions, which are considered "non-enhancing"), via the passage of an agent that can be seen on MRI as a brighter image. See *Robinson v. Sec'y of Health & Hum. Servs.*, No. 14-952V, 2021 WL 2371721, at *16 (Fed. Cl. Spec. Mstr. Apr. 12, 2021) ("[b]efore a patient has an MRI with contrast, they are injected intravenously with a contrast dye called gadolinium. In a healthy person, or in an MS patient not having a flare, that dye should remain in the bloodstream. However, if an MS patient is symptomatic, the gadolinium will leak into the brain through an opening in the blood-brain barrier and will show as an enhancing image on MRI"); *Taylor v. Sec'y of Health & Human Servs.*, No. 13-700V, 2018 WL 2050857, at * 21 & n.4 (Fed. Cl. Spec. Mstr. Mar. 9, 2018).

dates showed prolongations at T1-T2 and T3-T4, and an approximately 23-millimeter protrusion at T3-T4, none of which showed enhancement. *Id.* at 108, 218. A CT of Petitioner's head showed no evidence of infarction, however, and a later MRI of the brain showed no abnormal enhancement. *Id.* at 124, 189, 219, 280. And cerebrospinal fluid testing was negative for oligoclonal bands, an MS biomarker.[5] *Id.* at 427. Petitioner's discharge diagnosis was bilateral lower extremity weakness. *Id.* at 33.

After discharge, Ms. Stewart-Robinson went back to see Dr. Ma on October 23, 2019. Ex. 6 at 25. By this time, she was still experiencing bilateral extremity weakness and an unsteady gait, as well as numbness in the lower extremities and pelvic area ataxia. *Id.* On examination, however, she had full strength in all extremities, and pulses in all extremities were within normal limits. *Id.* at 26. Dr. Ma increased Petitioner's neuropathic pain medication and advised her to follow up with a neurologist plus engage in physical therapy. *Id.* That same day (during a call with Dr. Ma), Petitioner confirmed she had received a TM diagnosis after hospitalization, and expressed the concern that her September vaccination had been causal. *Id.* at 28. Dr. Ma did not comment on the accuracy of that belief, but instead proposed consultation with a neurologist. *Id.*

*Suspicion of MS (and Subsequent Confirmation of Diagnosis)*

On October 25, 2019, Petitioner saw neurologist Eliz Agopian, M.D., at which time she reported the symptoms of lower extremity numbness and tingling that had resulted in her prior hospitalization. Ex. 7 at 4. The numbness had now ascended to her lower torso, although she denied bowel or bladder incontinence and was not experiencing leg or upper body weakness. *Id.* On examination, Ms. Stewart-Robinson displayed sensory loss at C2-C3 areas and impaired balance, but her muscle strength was intact and her deep tendon reflexes were all rated at 2+. *Id.* at 6. Dr. Agopian reviewed prior imaging showing an enhancing lesion in the high cervical region but deemed the etiology of the lesion unclear, and proposed Petitioner be tested immediately to evaluate whether a vascular/infarction issue could be explanatory. *Id.*

To that end, Petitioner returned to the ED later that day. Ex. 10 at 521. Her ED treatment provider noted Petitioner's complaint of bilateral paresthesia for the prior four weeks (placing onset on or around September 27, 2019—two days after vaccination), but later also observed that Petitioner reported she had been experiencing a fluctuating "tightness/pulling sensation below the waist" for approximately *six months* (which, if accurate, would place onset on or about April 25,

---

[5] *See Samuels v. Sec'y of Health & Hum. Servs.*, No. 17-071V, 2020 WL 2954953 (Fed. Cl. Spec. Mstr. May 1, 2020) (experts agreeing that oligoclonal bands confirm the presence of MS). Oligoclonal bands themselves are a kind of immunoglobulin, or antibody, found in the central nervous system ("CNS"). Their presence in cerebrospinal fluid testing is evidence of inflammation within the CNS (and they do not appear in blood testing). *Oligoclonal Bands*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=60106&searchterm=oligoclonal+bands (last visited Sept. 3, 2026).

2019—well *prior* to vaccination). *Id*. The provider also reported that Petitioner had already been evaluated for "MS among other neuro diseases." *Id*. Petitioner declined to have another lumbar puncture and declined medication until she could see a neurologist. *Id*. at 523.

Petitioner saw a second neurologist (Adina Alport, M.D.) at New York Presbyterian Brooklyn Methodist Hospital a few days later, and complained of a tightening sensation from her belly button on down, along with numbness in her legs and genitals. Ex. 8 at 3. Her balance was poor, and she required assistance with ambulation. *Id*. at 3, 7. Exam revealed normal muscle strength and tone but reduced sensation below the knees in both legs. *Id.* at 6–7. Dr. Alport specifically notes in the record from this visit that although Petitioner's working diagnosis was TM of unknown etiology, MS or another central nervous system ("CNS") demyelinating disease, neuromyelitis optica ("NMO"), could not be ruled out. *Id.* at 8.

In early November, Petitioner underwent more spinal cord and brain imaging. A November 1, 2019 MRI of her thoracic spine showed a few hyperintense lesions located at the T3-T4, T8, and T9-T10 levels, with the T9-T10 lesion exhibiting enhancement. Ex. 8 at 9. In addition, a November 4, 2019 MRI of the cervical spine and brain showed approximately ten foci of signal change on the brain, the largest of which was suggestive of underlying demyelination (although no brain lesions appeared enhancing), plus some intramedullary lesions on the lower cervical spine which appeared demyelinating in nature. *Id*. at 18.

Petitioner returned to New York Presbyterian Brooklyn Methodist Hospital neurology on November 4, 2019, where she reported to certified physician's assistant Melissa Velez that she continued to experience numbness and tingling in her legs, plus some urinary complaints. Ex. 8 at 11. PA-C Velez noted that the imaging supported an MS diagnosis, though lumbar puncture results would be needed to confirm it. *Id*. at 15. Later that month, Petitioner attended several physical therapy appointments, and received Solumedrol (a glucocorticoid used to treat chronic inflammatory conditions, including MS)[6] infusions as well. Ex. 15 at 2–14; Ex. 9 at 14.

Petitioner reported to PA-C Velez feeling a bit better after these treatments. Ex. 8 at 23. PA-C Velez later diagnosed Petitioner with a demyelinating disorder, possibly MS, although other rheumatological or autoimmune disorders could not be eliminated, and a repeat lumbar puncture was deemed necessary. *Id*. at 27. The lumbar puncture was performed on December 3, 2019, and cerebrospinal fluid collected at this time now showed greater than five oligoclonal bands. Ex. 10 at 39–40.

---

[6] *See* SOLU-MEDROL® (methylprednisolone sodium succinate for injection, USP), https://labeling.pfizer.com/showlabeling.aspx?id=648#:~:text=SOLU%2DMEDROL%20Sterile%20Powder%20is,%2C%20odorless%20hygroscopic%2C%20amorphous%20solid. (last accessed Sept. 3, 2026).

On December 12, 2019, Petitioner returned to her PCP, Dr. Ma. Ex. 6 at 20. She reported that although her symptoms had improved, she continued to experience numbness in both feet, especially at night (with foot numbness the only issue revealed on exam). *Id.* at 20, 21. Dr. Ma noted that the etiology of her prior TM remained unknown, but could be related to an infection—or could suggest new-onset MS. *Id*. at 20. Petitioner also that month began a new round of physical therapy, informing the therapist that her symptoms had begun suddenly in October 2019 "after receiving a flu shot," but that she had since been diagnosed with MS. *Id*. She attended seven physical therapy sessions through March 13, 2020. Ex. 11 at 1–18.

*Treatment in 2020 and Beyond*

The medical records filed in this case establishing treatment received by Petitioner in 2020 to the present date confirm the propriety of the MS diagnosis—but do not reflect any findings that would make vaccine causation more, or less, likely.

In early January 2020, Petitioner again saw PA-C Velez and complained of worsening foot numbness, gait issues, tingling, and some urinary frequency issues. Ex. 8 at 35, 39. Testing for NMO had been negative, but prior lumbar puncture results showed greater than five oligoclonal bands and an IgG index of 1.5, which PA-C Velez characterized as "highly suggestive of MS." *Id.* at 39. PA-C Velez at this point formally included MS in her differential diagnosis (and did not mention TM), and it was agreed that Petitioner should begin a course of medication specific to treating MS. *Id*. at 39–40. By the spring, Petitioner's symptoms had improved somewhat, although she continued to experience numbness and burning in her feet. *Id.* at 42. PA-C Velez deemed Petitioner's MS to be "clinically stable" at this time. *Id*. at 47.

Nevertheless, Petitioner's symptoms and sequelae did not fully abate as time passed (more consistent with relapsing/remitting MS, rather than a monophasic, CNS demyelinating condition). In July 2020, Dr. Ma noted that Petitioner was best understood to have "MS of unknown etiology." Ex. 6 at 13. The same view was expressed by a physical therapist who saw Petitioner that month for home care. Ex. 12 at 13–25. And Petitioner informed PA-C Velez (at a July 20, 2020 visit) that she continued to experience stiffness in the lower extremities and numbness and burning in the bilateral feet—consistent with earlier that year. Ex. 8 at 56. PA-C Velez recommended repeat MRIs of the brain and cervical spine. *Id*. at 61.

In September 2020, Ms. Stewart-Robinson returned to Dr. Ma, reporting some improvement but that she was still experiencing ongoing numbness in both feet. Ex. 6 at 5. Later that month, however, she began to feel some intermittent arm and head pain. *Id.* at 4. On September 23, 2020, she again saw PA-C Velez, after the pain became sharper and was associated with headaches. Ex. 8 at 63. She also noticed stiffness in her legs, especially in the morning, and numbness and burning in her feet. *Id*. The same issues lingered on into October, coupled with

gait/balance improvements. Ex. 13 at 4. A brain MRI performed in this time period showed no significant interval change in Petitioner's white matter lesions. *Id*. at 61–62.

The remaining medical records filed in this case (for treatment received through the middle of 2021) reveal ongoing, intermittent symptoms consistent with Petitioner's experience in 2019-20, with her receipt of the same treatments, plus additional physical therapy, she underwent before. No records undermine the MS diagnosis, however, nor do they reflect treater thinking on an association between Petitioner's medical issues and her receipt of the flu vaccine.

## II. Expert Reports

### A. Petitioner's Expert – Dr. Carlo Tornatore

Dr. Tornatore is a neurologist, and he prepared two written reports in this case for Petitioner. Report, dated Dec. 18, 2024, filed as Ex. 19 (ECF No. 57-2) ("First Tornatore Rep."); Report, dated Aug. 29, 2025, filed as Ex. 55 (ECF No. 65-2) ("Second Tornatore Rep.").

Dr. Tornatore graduated from Cornell University with a Bachelor of Arts and Sciences in Neurobiology, and attended Georgetown University School of Medicine, where he received his medical degree. Curriculum Vitae, filed as Ex. 54 (ECF No. 61-2) ("Tornatore CV") at 1. He subsequently completed an internship in Internal Medicine in the Department of Medicine at Providence Hospital, followed by a residency in Neurology in the Department of Neurology at Georgetown University Hospital. *Id.* at 2. Thereafter, he pursued a fellowship in Molecular Virology at the National Institute of Health in Bethesda, Maryland. *Id.* Dr. Tornatore currently serves as a Professor and Chairman of the Department of Neurology at Georgetown University of Medical Center, Chairman and Neurologist-in-Chief of the Department of Neurology at Medstar Georgetown University Hospital in Washington, D.C., and Medstar Health's regional Director of Neurology. *Id.* at 2–3. H has published extensively in the area of MS and other autoimmune disorders, as well as evaluated and treated individuals with various inflammatory conditions of the brain and spinal cord. First Tornatore Rep. at 2.

*First Report*

Dr. Tornatore's first report began with an overview of Petitioner's medical history, highlighting aspects of it that he deemed particularly relevant to his expert opinion. First Tornatore Rep. at 2–8. He noted that at the time of Petitioner's presentation at the hospital on October 13, 2019, she was complaining of sensory symptoms (bilateral numbness from the waist down) beginning within approximately two and one-half weeks post-vaccination, that she had been experiencing fevers, and that blood work revealed elevated monocytes, or "monocytosis" (with Dr. Tornatore contending the latter two elements were evidence of "ongoing inflammation"). *Id.*

at 4. A spinal cord MRI performed a few days later revealed nonspecific findings but evidence of some enhancing demyelinating lesions (meaning some were more recent—perhaps less than two or three weeks old). *Id.* at 4, 5. But as of mid-October, she displayed no oligoclonal bands (a common biomarker for MS). *Id.* at 5.

By the end of October 2019, Dr. Tornatore emphasized, Petitioner's clinically-observable symptoms, supplemented with imaging and CSF results, were deemed by contemporaneous treaters to be consistent with "transverse myelitis of unknown etiology" (although the same record noted the possibility that TM was "maybe secondary to infectious process *versus newly onset,* [MS]"—in other words, the TM symptoms reflected an infection or stood as an initial MS manifestation). First Tornatore Rep. at 6; Ex. 8 at 8. However, Dr. Tornatore's medical record summary (reflecting the progression of Petitioner's treatment into November and December) tacitly accepted that the MS diagnosis gained support over time, as treaters observed additional new thoracic spinal cord lesions, more evidence of CSF inflammation, and the appearance of oligoclonal bands. First Tornatore Rep. at 7–9. He nevertheless stressed that "the vast majority" of lesion evidence was seen in Petitioner's spinal cord rather than brain, and that Petitioner displayed enhancing and non-enhancing lesions in imaging, all of which was consistent with a pre-vaccination disease process that worsened after—and that might explain why treaters first arrived at a TM diagnosis. *Id.* at 8.

Dr. Tornatore thereafter turned to his actual opinion, outlining the matters he intended to address. *See generally* First Tornatore Rep. at 9. First, he purported to explain the diagnosis in this case, stating in forthright manner that "[t]here is no question that the diagnosis in this case is MS." *Id.* at 11. But he used this part of his report to introduce the idea that whatever the *ultimate* diagnosis was, Petitioner's condition likely predated, and was aggravated by, vaccination. *Id.* at 10–12. Dr. Tornatore highlighted that Petitioner's initial MRIs from October did not reveal enhancing lesions—meaning they were likely "present prior to the administration of the flu vaccine." *Id.* at 10. He cited in support items of literature suggesting that non-enhancing lesions seen from imaging are likely two to three-weeks old. *Id.* at 10–11; M. Lai et al., *A Preliminary Study into the Sensitivity of Disease Activity Detection by Serial Weekly Magnetic Resonance Imaging in Multiple Sclerosis*, 60 J. of Neurology, Neurosurgery, & Psychiatry 339, 340 (1996), filed as Ex. 21 (ECF No. 57-4) (stating that "[o]f the 25 new enhancing lesions which could be followed up from the beginning to the end of enhancement, 11 (44%) enhanced for less than one month (on three scans or less)" and "[t]wo lesions enhanced on just one scan"); F. Cotton et al., *MRI Contrast Uptake in New Lesions in Relapsing-Remitting MS followed at Weekly Intervals*, 60 Neurology 640, 642 (2003), filed as Ex. 22 (ECF no. 57-5) (reporting an average duration of gadolinium enhancement in individual new lesions was 3.07 weeks).

This in turn, Dr. Tornatore reasoned, allowed for the inference that Petitioner likely "had a propensity for autoimmunity of the CNS," since she also revealed more recent enhancing lesions

as well. First Tornatore Rep. at 10, 11. This was consistent with aggravation of a preexisting disease process, based on the concept that vaccination unleashed an "inflammatory cascade" thereafter, evidenced by the more recent lesions plus the proof of CSF inflammation. *Id.* at 11. He also opined that the spinal cord lesion emphasis was "unusual" for MS, while more consistent with other kinds of demyelinating CSF-oriented neuroinflammatory diseases. *Id.* And since MS was thought (at least by one referenced article) to be triggered by some unidentified "systemic immune system" stimulus, this allowed for vaccination as that trigger. *Id.* at 12; B. Bechner et al., *Targeting Cytokine Networks in Neuroinflammatory Diseases*, 23 Nat. Rev. Drug Discovery 862, 866 (2024), filed as Ex. 23 (ECF No. 57-6).

Second, Dr. Tornatore proposed that "external factors" could aggravate a pre-existing demyelinating condition, and he attempted to provide a number of possible analog examples, as well as some direct instances involving vaccination itself. First Tornatore Rep. at 12–27. Older studies had observed that treatment of MS patients with "systemic gamma-interferon" (an immune-regulating cytokine that activates pathogen-fighting macrophages)[7] had resulted in relapses of disease activity, rather than arresting symptoms. *Id.* at 13; H. Panitch, et al., *Treatment of Multiple Sclerosis with Gamma Interferon: Exacerbations Associated with Activation of the Immune System*, 37 Neurology 1097, 1098 (1987), filed as Ex. 24 (ECF No. 57-7) ("Panitch") (showing that "[s]even of the 18 patients had exacerbations of MS during 18 patient-months of IFN treatment"). And in some patients, relapse occurred even in the absence of evidence of the cytokine in blood serum, which Dr. Tornatore noted stood as proof that "downstream effects" of the immune activation accomplished by this cytokine could persist long after the impact of the external factor had ceased. First Tornatore Rep. at 13. (Of course, Panitch involved individuals who *already* had been diagnosed with MS (not that they were subclinical), and thus whatever disease process was driving it could have been occurring regardless of transient instances of immune activation).

This same cytokine activation was possibly due to receipt of a flu vaccine, Dr. Tornatore contended. First Tornatore Rep. at 13–14. Studies had shown that after receipt of the flu vaccine, vaccinated individuals would realize "a significant expression" of the gamma-interferon cytokines. W. O'Gorman et al., *The Split Virus Influenza Vaccine Rapidly Activates Immune Cells through Fcγ Receptors*, 32 Vaccine 1, 16 Fig. 3 (2014), filed as Ex. 25 (ECF No. 57-8); N. Otani et al., *Changes in Cell-Mediated Immunity (IFN-γ and Granzyme B) Following Influenza Vaccination*, 13 Viruses 1137 (2021), filed as Ex. 26 (ECF No. 57-9). The vaccine could promote "downstream immunologic changes" that could manifest as "CNS inflammation." First Tornatore Rep. at 14.

---

[7] "Interferon-γ" is defined as "the major interferon produced by lymphocyte cultures immunologically stimulated by mitogens or antigens; the primary producer cells are T lymphocytes, and the major activity is immunoregulation. IFN-γ has been implicated in aberrant expression of class II histocompatibility antigens by tissue cells (such as thyroid cells) that do not normally express them, leading to autoimmune disease." *Interferon-γ*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=83012 (last visited Sept. 3, 2026).

Indirect evidence of the general fact that external stimuli in MS patients could result in return of symptoms (which Dr. Tornatore noted were deemed “pseudo-relapses”) was also to be found in the long-understood concept of “Uhthoff’s phenomenon.” First Tornatore Rep. at 14–15; T. Guthrie & D. Nelson, *Influence of Temperature Changes on Multiple Sclerosis: Critical Review of Mechanisms and Research Potential*, 129 J. Neurological Sciences 1,3 (1995), filed as Ex. 27 (ECF No. 57-10). Uhthoff’s phenomenon has in fact been known to be an MS feature for well over 100 years, and involves the observed fact that “[w]hen an individual with underlying asymptomatic demyelinating lesions has even a minimal increase in their body temperature (0.5 degree) due to systemic or external stimuli, areas of previous demyelination will develop neuronal conduction block resulting in the abrupt onset of neurologic symptoms, even symptoms that the patient had previously not experienced.” First Tornatore Rep. at 14. The symptoms associated with a temperature increase typically subside in a short period of time, but “not infrequently” they can persist (even though they are not attributable to additional demyelination). *Id.* at 14, 15.

Vaccines—and their recognized capacity to induce fever and/or raised body temperature—have, Dr. Tornatore contended, been “long recognized as a risk factor for developing Uhthoff’s phenomena,” and thus could in rare circumstances worsen existing MS. First Tornatore Rep. at 15; T. Monschein et al., *Vaccination and Multiple Sclerosis in the era of the COVID-19 Pandemic*, 92 J. Neurology, Neurosurgery & Psychiatry 1 (2021), filed as Ex. 28 (ECF No. 58-2) (“Monschein”) (stating “[a]pproved vaccines are considered overall relatively safe” as “[t]]he vast majority of adverse events (AE) are limited to local reactions and mild systemic reactions such as fever”; however”[r]aised body temperature could trigger Uhthoff’s phenomenon”). Studies had determined that the cytokine increases that occurred in the wake of vaccination were generally associated with malaise-like side effects (including body temperature increases)—thus allowing for the possibility that Uhthoff’s phenomenon could occur as well after vaccination. *Id.*; *see also* L. Christian et al., *Proinflammatory Cytokine Responses Correspond with Subjective Side Effects after Influenza Virus Vaccination*, 33 Vaccine 3360 (2015), filed as Ex. 29 (ECF No. 58-3); K. Talaat et al., *Rapid Changes in Serum Cytokines and Chemokines in Response to Inactivated Influenza Vaccination*, 12 Influenza & Other Respiratory Viruses 202 (2018), filed as Ex. 30 (ECF No. 58-4).

Notably, however, these studies did not involve evaluation of the actual risk of MS worsening in the wake of receipt of the flu vaccine (a proposition that other evidence offered in this case by Respondent *directly* addresses), and ultimately did not rebut the general view that an MS patient’s response to “heating” is not only common, but most commonly transient. *See, e.g.*, Monschein at 5 (noting that “[a]bout 80% of patients with MS deteriorate when heated, . . .” but “[an] *unexplained* number of paradoxical responses to [heating] are in the literature,” including both instances where heating-related relapse is followed by remittance, as well as instances where overall MS worsening is seen) (emphasis added).

Dr. Tornatore observed another possible mechanism by which MS worsening could occur, and he maintained receipt of a flu vaccine could be a factor in its operation. First Tornatore Rep. at 17–27. Citing research in support, he proposed that mimicry between peptide sequences in nerve myelin basic protein (believed to have encephalitogenic potential in humans) and an experimentally-altered peptide ligand ("APL") had been shown to have the potential of exacerbating MS in a subgroup of studied subjects. First Tornatore Rep. at 17–19; B. Bielekova et al., *Encephalitogenic Potential of the Myelin Basic Protein Peptide (Amino Acids 83-99) in Multiple Sclerosis: Results of a Phase II Clinical Trial with an Altered Peptide Ligand*, 6 Nature Med. 1167, 1168 (2000), filed as Ex. 31 (ECF No. 58-5) ("Bielekova"). In fact, the exacerbation accomplished by use of the APLs caused persistent immune activity. Bielekova at 1169.

I am familiar with Bielekova, a study Dr. Tornatore has cited in other cases involving allegations of vaccine-induced or aggravated MS. Bielekova's authors sought to identify potential immune-suppressive treatments for MS, relying on the theory that MS (understood to be an autoimmune disease) is mediated by a T cell that is "myelin-specific," and hence that the blocking of certain T cell responses might be therapeutic. Bielekova at 1167. Its authors treated 24 patients previously diagnosed with relapsing-remitting MS with a lab-designed APL (altering a specific peptide T-cell receptor in the MBP) that was also a molecular mimic of the relevant MBP protein, administering the protein mimic on a weekly basis over a nine-month period. *Id.* at 1167, 1173.

Only one subject completed the entire treatment, however, and three experienced lesion exacerbations that caused the researchers to reduce trial dosage (although only one subject's relapse was considered to be treatment-related). Bielekova at 1167–68, 1173. Bielekova's authors were able to identify two of the three patients whose MS was exacerbated where the APL alterations were considered to have highlighted the "encephalitogenic potential" of the peptide at issue. *Id.* at 1168, 1170, 1172; First Tornatore Rep. at 17. Bielekova observed overall that "[t]he selected dosing regimen was poorly tolerated" in the subject patients, and "did not generally improve *or* worsen disease," although the study did find that some T cells thought necessary to suppress aberrant immune activity characteristic of MS were expanded in number through administration of the mimic protein. Bielekova at 1172–73 (emphasis added). Nevertheless, its authors deemed their ultimate findings "disappointing," agreeing that "there is little doubt that the administration of [the protein MBP mimic] activated disease-mediating T cells." *Id.* at 1173.

Dr. Tornatore opined that Bielekova's findings about the capacity of MS worsening after exposure to a mimicking antigen (albeit with respect to less than *half* of an already-small eight-person sample) were highly significant. First Tornatore Rep. at 17–20. He characterized the findings as "strong evidence that immunization with peptides that bear resemblance to MBP can result in acute inflammatory events in the CNS." *Id.* at 20.[8] But this contention greatly exaggerates

[8] Notably, this exact statement is contained in a report filed in a related case discussed below (thus underscoring my familiarity with Dr. Tornatore's general theory, even if it is not identical in all respects to prior versions he has offered).

Bielekova's findings. For one thing, Bielekova's initial goal had been to identify helpful immune therapies for treatment of MS, and thus the risk factors Dr. Tornatore emphasizes from the study were incidental (lessening their reliability slightly at the outset, since the study was not structured to establish MS exacerbation risk). Bielekova at 1173. In addition, and as observed above, Bielekova involved a very small sample of patients who already had clinical MS (not asymptomatic, subclinical MS—as here), further reducing how much weight its findings should be given in this context. And Bielekova did not measure the impact of receiving a single, one-time dose of *flu vaccine* on existing MS patients. Bielekova's subjects were instead receiving doses of the relevant, immune-stimulating mimic antigen (the association of which to MBP and the disease processes of MS was far better known than the flu or Tdap vaccines) on a *weekly or monthly basis* during the observed period.

An even more compelling reason to give Bielekova less weight than Dr. Tornatore proposes arises from the fact that a core premise it (purportedly) embraces has not since been corroborated by additional research. Bielekova's authors (writing in 2000—thus 26 years ago), stated that the "current pathogenic concept of MS ... assumes that autoreactive T cells are activated in susceptible individuals *most likely by cross-reactive foreign agents*." Bielekova at 1173 (emphasis added). (This in fact, the authors go on to say, is "the foundation for the development of EAE[9] as an animal model for MS," and thus such experimentation contributes to the conception that such disease processes work from the "outside in"—when in fact this assumption may be somewhat outdated, even if the findings from these studies are methodologically reliable).

This foundational premise is congruent with Dr. Tornatore's theory in this case, in which a vaccine serves as the "foreign agent" (or at least the instigating factor for creation of the antibodies or other immune cells directly causing autoimmune harm, if not merely producing a secondary stimulus capable of worsening MS's course). And yet that premise has not been tested enough by medical science to amount to more than reasoned, if plausible speculation. Moreover, the experiment in Bielekova involved *direct transmission* of peptides, not induction of cross-reactive antibodies. It is a category error to conflate receipt of inactivated flu antigens contained in a vaccine (which may or may not result in cross-reactivity due to molecular mimicry) with research-driven "immunization" of peptides engineered to cross-react. Bielekova at best suggests that MBP is a possible situs for *further* nerve damage in existing MS patients, but it does not establish that damage *begins* here—let alone due to cross-reactivity from antibodies generated by a vaccine—or that this kind of possible cross-reactivity leads to disease exacerbation.

Dr. Tornatore nevertheless maintained that Bielekova effectively opened the door to the possibility that exposure to a flu vaccine's antigens could have the same impact as the experimental

[9] EAE stands for "experimental autoimmune encephalomyelitis"—a lab model that involves injecting animals (usually mice) with myelin basic protein and is used to measure brain inflammation in connection with CNS demyelinating conditions (such as MS). *See Maciel v. Sec'y of Health & Hum. Servs.*, No. 15-362V, 2018 WL 6259230, at *8 (Fed. Cl. Spec. Mstr. Oct. 12, 2018).

APLs used in that study. First Tornatore Rep. at 19, 20–27. To bulwark this part of his theory, Dr. Tornatore offered studies involving other kinds of neuropathic injuries, like Guillain-Barré syndrome ("GBS"), where it was demonstrated that the flu vaccine could cause the generation of antibodies to gangliosides (which contain protein components also found in the CNS and spinal cord). I. Nachamkin et al., *Anti-Ganglioside Antibody Induction by Swine (A/NJ/1976/H1N1) and Other Influenza Vaccines: Insights into Vaccine-Associated Guillain-Barré Syndrome*, 198 J. Infectious Diseases 226 (2008), filed as Ex. 32 (ECF No. 58-6) ("Nachamkin").

In addition, EAE animal model studies highly relevant to understanding MS had observed that direct "immunization"[10] with MBP-derived antigens could produce MS-like symptoms. *See* C. Procaccini et al., *Animal Models of Multiple Sclerosis*, 759 Eur. J. Pharmacology 182, 183 (2015), filed as Ex. 33 (ECF No. 58-7). Dr. Tornatore felt these models had comparative utility here, since Petitioner's lesions were longitudinal (and hence consistent with a subset of TM, "longitudinally extensive transverse myelitis," or "LETM"). First Tornatore Rep. at 22. In EAE experimental models, it had been shown that "a short stretch of amino acids" in flu vaccine peptides that were homologous to CNS peptides could result in LETM. *Id.* Thus, molecular mimicry (an oft-cited mechanistic explanation for autoimmunity in Vaccine Program cases) could explain the pathogenic process initiated by the immune system's exposure to the flu vaccine.

To support this contention, Dr. Tornatore referenced a "historical perspective" that he contended could be ascertained from a series of now-somewhat stale studies and articles. *See generally* First Tornatore Rep. at 22–24 (*citing* D. Ziegler et al., *Experimental Allergic Neuritis-Like Disease in Rabbits After Injection with Influenza Vaccines Mixed with Gangliosides and Adjuvants*, 42 Infection & Immunity 824, 829 (1983), filed as Ex. 34 (ECF No. 58-8) ("Ziegler"); U. Jahnke et al., *Sequence Homology Between Certain Viral Proteins and Proteins Related to Encephalomyelitis and Neuritis*, 229 Science 282, 283 (1985), filed as Ex. 35 (ECF No. 58-9)).

Dr. Tornatore deemed these articles to constitute "solid scientific evidence that peptides found in influenza vaccinations can lead to CNS inflammatory disease due to molecular mimicry," although (as discussed below) this is not the first time Dr. Tornatore has referenced this series of articles in a case involving MS. First Tornatore Rep. at 24. Nor are these articles particularly persuasive or robust evidence supporting causation.

To extend the persuasive value of these older articles, Dr. Tornatore referenced a somewhat-more recent item of literature (albeit now more than 20 years old) that he maintained demonstrates that a wild flu virus could specifically provoke cross-reactive autoimmunity in an

---

[10] As noted above in my discussion of Bielekova, this use of the term *immunization*—in the context of an experiment, where a subject is directly injected with a protein component sequence intended to spark a reaction and/or taken directly from an intended mimic, and where a powerful experimental adjuvant is employed so that observable results can be obtained—is wholly distinguishable from when a person is "immunized" with a vaccine.

MS context. First Tornatore Rep. at 25–26; S. Markovic-Plese et al., *High Level of Cross-Reactivity in Influenza Virus Hemagglutinin-Specific CD4+ T-Cell Response: Implications for the Initiation of Autoimmune Response in Multiple Sclerosis,* 169 J. Neuroimmunology. 31 (2005), filed as Ex. 43 (ECF No. 29-4) ("Markovic-Plese"). That article observed that "T cells that recognized influenza antigens found in the influenza vaccine can likewise recognize CNS antigens," making a "downstream autoimmune response" possible. First Tornatore Rep. at 27. To bulwark its findings, Dr. Tornatore conducted his own software research to assess whether there was amino acid sequential homology between flu vaccine antigens and MBP, using methods common to Program experts. *Id.* at 25–27.[11] That research established the existence of sequences consistent with Markovic-Plese's determinations. *Id.* at 27.

Markovic-Plese, however, does not support causation as firmly as Dr. Tornatore suggests. In it, researchers derived a clone of a "T helper" cell (a kind of T cell that aids B cells in their production (in the adaptive immune response) of antibodies that will recognize and attack foreign pathogens) from the serum of an existing MS patient who was then also experiencing an influenza A infection (hence a wild infection, not a vaccination), using it *in vitro* to compare cross-reactive potential with different peptides relating to myelin basic protein—a "putative autoantigen in MS." Markovic-Plese at 32. And Markovic-Plese's authors did in fact identify mimicking peptide sequences that were also cross-reactive. *Id.* at 37. But the study aimed not to identify possible causes of MS, but instead to learn about ways to *improve* vaccine function in order to "provide a longer-lasting protection against viral infections and possibly decrease their effect on initiation of relapses in MS." *Id.* Markovic-Plese says nothing about the capacity of a *nonadjuvanted and inactivated flu vaccine* to cause disease in this manner—and it did not even test what the *actual* target antigen in MS would be.

Dr. Tornatore next attempted to amplify the significance of Petitioner's initial, TM-like presentation (even if Petitioner had ultimately been properly diagnosed with MS). First Tornatore Rep. at 28–34.He noted that TM involved damaging spinal cord inflammation that would destroy nerve myelin, causing nerve disfunction. *Id.* at 28. TM, he contended, "exists on a continuum of neuro-immunologic disorders," some of which impacted peripheral nerves (like GBS), while others (MS and TM) impacted the CNS. *Id.* Dr. Tornatore also acknowledged that medical science had perhaps come to the conclusion that "TM" should be "retired" as a specific diagnostic classification, in favor of an approach where "these entities [are] referred to simply as myelitis, with further refinement based on the underlying etiology." *Id.;* K. Blackburn & B. Greenberg,

[11] Dr. Tornatore utilized the Basic Local Alignment Search Tool ("BLAST"), a medical/scientific internet resource that assists researchers in finding regions of similarity between biological sequences of amino acids. The program compares nucleotide or protein sequences to sequence databases and calculates the statistical significance. BLAST, U.S. National Library of Medicine, https://blast.ncbi.nlm.nih.gov/Blast.cgi (last visited Sept. 2, 2026). A BLAST search involves review of an online database to "compare[ ] nucleotide and protein sequences, to search for a homology between the … vaccine and [the body's myelin basic protein]." *Montgomery v. Sec'y of Health & Hum. Servs.*, No. 15-1037V, 2019 WL 2511352, at *5 (Fed. Cl. Spec. Mstr. May 21, 2019).

*Revisiting Transverse Myelitis: Moving Toward a New Nomenclature,* 11 Frontiers. Neurol. 1 (2020), filed as Ex. 32 (ECF No. 28-2) ("Blackburn & Greenberg") at 2 (observing that not all myelopathies are attributable to inflammation, but can have other pathogenic mechanisms or etiologies).

TM, Dr. Tornatore opined, can be vaccine-caused. First Tornatore Rep. at 28–30. In support, Dr. Tornatore referenced several case reports (which he deemed "long recognized as important contributions to the scientific literature" on causation) that had memorialized observed instances of TM developing in a post-vaccination context. *Id;* at 30, 31; *Adverse Effects of Vaccines: Evidence and Causality*, Institute of Medicine (K. Stratton et al., eds. 2012), filed as Ex. 44 (ECF No. 59-9) ("2012 IOM Rep."), at 42. Dr. Tornatore identified in particular a number of case reports in which LETM was observed after an individual received a flu vaccine. First Tornatore Rep. at 31–32; W. Akkad et al., *Longitudinally Extensive Transverse Myelitis Following Vaccination with Nasal Attenuated Novel Influenza A(H1N1) Vaccine*, 67 Arch. Neurol. 1018 (2010), filed as Ex. 47 (ECF No. 60-3) ("Akkad") (discussing individual who developed LETM and where "[e]xtensive diagnostic evaluation effectively ruled out causes other than vaccination-associated [TM]"); N. Nakamura et al., *Neurologic Complications Associated with Influenza Vaccination: Two Adult Cases*, 42 Internal Med. 191 (2003), filed as Ex. 48 (ECF No. 60-4) ("Nakamura") (describing two cases of neurologic complications occurring after receipt of an influenza vaccination). He deemed the latter two reports to include "very strong mechanistic evidence," highlighting that LETM was a relatively newly-understood diagnostic "entity."[12] He particularly emphasized Nakamura, since its authors found that one of the two vaccinated subjects they reported on possessed antibodies to an expected target antigen on the MBP (linking the case to what was known about causation for peripheral neuropathies like GBS). Nakamura at 193; First Tornatore Rep. at 33.

Another factor, in Dr. Tornatore's view, heightening the relevance of TM's putative vaccine association in the context of this case was the fact that Petitioner had not *initially* tested positive for oligoclonal bands. First Tornatore Rep. at 11, 34. Oligoclonal bands are a recognized MS biomarker, and their presence suggests that "some component of the inflammatory process has become established inside the blood-brain barrier" that protects the CNS from the rest of the body. *Id.* at 34. Because of the absence of the bands when Petitioner was tested for them in mid-October 2019, they could only have "emerged" after vaccination. *Id.*

[12] Dr. Tornatore also suggested some of the case reports he referenced involved TM after publication of the 2012 IOM Report (which he seemed to reluctantly admit did *not* consider a flu vaccine-TM association to be well-founded). First Tornatore Rep. at 33; 2012 IOM Report at 338. But it is not self-evident why the date of publication of a single case report describing the temporal development of a disease after a vaccination bears on its probative weight—and in fact the reports he emphasizes (Akkad and Nakamura) were published *before* the 2012 IOM Report.

This temporal delay in test discovery of the presence of oligoclonal bands, Dr. Tornatore contended, supported the conclusion that peripheral inflammation due to vaccination was driving the disease process. First Tornatore Rep. at 34. In support, he referenced a study. C. Beseler et al., *The Complex Relationship Between Oligoclonal Bands, Lymphocytes in the Cerebrospinal Fluid, and Immunoglobulin G Antibodies in Multiple Sclerosis: Indication of Serum Contribution,* 12 PLOS ONE 10:1 (Oct. 2017) (https://doi.org/10.1371/journal.pone.0186842), filed as Ex. 49 (ECF No. 60-5) ("Beseler"). Beseler (drawing upon other studies supporting a "strong connection between IgG [antibodies] in the peripheral blood and that in the CNS of MS patients") sought to evaluate the serum and CSF findings in a sample of 115 subjects, 91 of whom had been diagnosed with MS. Beseler at 2. The authors concluded, among other things, that there were nonlinear but "complex" associations between the number of oligoclonal bands[13] (which would only be seen/developed within the CSF)[14] and CSF IgG, on the one hand, and serum IgG on the other. *Id.* at 4. But they also proposed that their data raised a question as to how "intrathecal IgG" (meaning found in the CSF) could possibly be produced at the levels they perceived, and they tentatively proposed that blood serum-derived IgG was contributing to what was seen within the CSF. *Id.* at 9.

Importantly, Beseler's authors only advanced this concept as a *hypothesis*, and they referenced a fairly-old article (published in 1971—but not apparently filed in this case) as "compelling" support for evidence of "antibody-mediated demyelination in MS"—something that has not particularly been borne out over the 50-plus years since (at least in helping identify MS's pathogenic trigger). Beseler at 11. Beseler certainly does not stand for the conclusion that oligoclonal bands are generated *outside* the CNS. But Dr. Tornatore deemed it further proof that "an inflammatory event in the periphery could trigger an immune response that ultimately will result in a CNS inflammatory event"—and here, that peripheral event could be vaccine-mediated, since the kind of IgG antibodies that a vaccine could promote had some relationship to oligoclonal bands. First Tornatore Rep. at 34. (This contention did not, however, explain (a) why it should be assumed one event—peripheral inflammation—would promote CNS inflammation, or (b) how long it would take for purported peripheral inflammation to breach the blood brain barrier before it could cause the suggested secondary CNS inflammation).

---

[13] Beseler acknowledged the significance of oligoclonal bands in MS—among other things, they may be explanatory of how a patient's MS progresses from an initial CIS. Beseler at 2 ("OCBs are associated with increased levels of disease activity and disability, a greater risk of second attack, the conversion from a clinically isolated syndrome (CIS) to early [relapsing-remitting MS], and greater brain atrophy").

[14] The presence of oligoclonal bands reflect ongoing inflammation *originating* in the CNS rather than outside it, such as in the periphery of the body. *See Lozano v. Sec'y of Health & Hum. Servs.*, No. 15-369V, 2017 WL 3811124, at *3 (Fed. Cl. Spec. Mstr. Aug. 4, 2017), *mot. for review den'd*, 143 Fed. Cl. 763 (2019), *aff'd*, 958 F.3d 1363 (Fed. Cir. 2020).

Dr. Tornatore next attempted to link the total course of Petitioner's injury—beginning with her seeming-TM (which he had alleged could be vaccine-caused), but then progressing to MS later—to the receipt of the flu vaccine. First Tornatore Rep. at 34–38. For support, Dr. Tornatore referenced an article involving "the marmoset model of MS." *Id.* at 34; B. t'Hart, *Experimental Autoimmune Encephalomyelitis in the Common Marmoset: A Translationally Relevant Model for the Cause and Course of Multiple Sclerosis,* 6 Primate Biol. 17 (2019), filed as Ex. 50 (ECF No. 60-6) (the "Marmoset Paper"). Dr. Tornatore maintained that this article highlighted (via animal model experiments involving EAE) one particular study in which animals immunized with mimics for a particular nerve myelin component (myelin oligodendrocyte glycoprotein, or "MOG") go on to develop MS-like CNS lesions, and in turn a progressive disease course comparable to human MS. First Tornatore Rep. at 34–37.

Dr. Tornatore found significant that this kind of experiment discussed in the Marmoset Paper revealed that "one need not have a humoral response against MOG to have an immune response (cellular in nature)." First Tornatore Rep. at 37.[15] And he noted that, in fact, molecular amino acid sequence homology can be shown between hemagglutinin in the flu vaccine and MOG peptides (based on Dr. Tornatore's own "BLAST" search). *Id.* Thus, it was scientifically conceivable not only that the flu vaccine could result in this specific kind of MS-associated damage, but also that it might do so independent of the creation of antibodies against this specific CNS-associated nerve tissue component.

The Marmoset Paper, however, stands for far less (and at times even contradicts the concept of vaccine causation).[16] For starters, the main thrust of the article was its author's *defense* of this particular type of animal EAE study as scientifically worthwhile, despite objections to the ethics of such animal model research. Marmoset Paper at 19. With that goal, the article reviews numerous published marmoset-model studies involving MS, emphasizing the benefits of their findings in increasing medical science's comprehension of MS from many angles. The Marmoset Paper acknowledged, however, that questions have been raised about how relevant its findings actually are to human MS (although the paper's author is clearly in the camp of favoring animal model EAE experiments for the study of MS). *Id.* at 22–23. The Marmoset Paper thus does not reflect a study of its own, but is a review article lobbying in favor of this subset of animal study, and while it discusses results of a number of animal studies, it does not do so with the aim of concluding anything other than that these studies are worthwhile.

[15] "Humoral" is defined as "pertaining to elements dissolved in the blood or body fluids, e.g., humoral immunity from antibodies in the blood as opposed to cellular immunity." *Humoral*, Dorland's Medical Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=23202&searchterm=humoral (last visited Sept. 2, 2026).

[16] As discussed below, this is the second case I have recently decided in which Dr. Tornatore invoked the Marmoset Paper in defense of a vaccine causation theory for MS—and not only here has he not provided new or additional bases for giving it weight, but he employs some of the same exact turns of phrase in discussing it (underscoring my familiarity with this theory—and its significant evidentiary deficiencies).

The Marmoset Paper also makes numerous statements regarding MS's likely pathogenesis that run counter to a causal foundation in Petitioner's case: that administration of a *single dose* of flu vaccine could cause, or impact, a disease process culminating in MS. For example, it notes that some marmoset-specific experiments shed light on the possibility that "MS *might not be elicited by infection . . ., but by primary injury inside the central nervous system*." Marmoset Paper at 18 (emphasis added). It later notes that this possibility could be characterized as the "inside-out paradigm," in which lesions within the CNS drive disease processes due to a "physiological response to sustained excess antigen turnover in diseased tissues (the primary lesion)." *Id.* at 22; *see also id.* at 21 ("[t]he pathological hallmark of MS and the most likely cause of the accumulating neurologic deficits is the lesion").

The Marmoset Paper acknowledges uncertainty as to whether this theoretical construct for MS causation has been proved over an "outside-in" scheme (where "MS is triggered by an external factor"—here, a vaccine), but its author clearly seems to *disfavor* the latter. Marmoset Paper at 31. In fact, its author writes that "data obtained in the marmoset EAE model are *strongly supportive* for the inside-out paradigm." *Id.* at 22 (emphasis added). Thus, although the Marmoset Paper *does* reference a number of MS-relevant studies, and some could be reasonably invoked to show how a foreign antigen (like a vaccine component) might have sufficient homologic similarity with nerve-related tissues for an autoimmune cross-reaction to occur, they are referenced to bulwark the model's value—*not* because the author believes this is how MS likely occurs. This calls into question the fundamental assumption of Dr. Tornatore's theory—that a single vaccination could cause a resulting pathogenic cascade that fundamentally occurs in the CNS. And the Marmoset Paper even expressly states that vaccination does not cause MS. *Id.* at 29 ("[t]he consideration that MS is *obviously* not elicited by injection of an antigen/adjuvant formulation but develops spontaneously" points toward the need for research about how a CNS lesion might result in myelin damage that is reflected by clinical symptoms) (emphasis added).[17]

The remainder of Dr. Tornatore's report featured a review of the other causation prongs. *See generally* First Tornatore Rep. at 38–42. With respect to the "did cause" prong, Dr. Tornatore maintained that the record established a "logical sequence of cause and effect" from vaccination to onset. *Id.* at 38. Petitioner likely possessed "pre-existing, asymptomatic lesions" before vaccination, and the flu vaccine caused the production of cytokines and vaccination-associated malaise comparable to Uhthoff's phenomena, while also likely (as reflected by her initial, myelitis-

---

[17] In addition, Dr. Tornatore's first report referenced unfiled experiments or studies discussed in the Marmoset Paper, as well as their data. *See, e.g.*, First Tornatore Rep. at 35 (reproducing a portion of "Figure 2" of Marmoset Paper (p. 19)). This Figure seems itself to have been derived from a *different* item of literature referenced in the Marmoset Paper but published in 1998. Marmoset Paper at 18 (referencing 't Hart et al., *Histopathological Characterization of Magnetic Resonance Imaging—Detectable Brain White Matter Lesions in a Primate Model of Multiple Sclerosis: A Correlative Study in the Experimental Autoimmune Encephalomyelitis Model in Common Marmosets (Callithrix jacchus)*, 153 Am. J. Pathol. 649–63 (1998) (*see* Marmoset Paper at 57 (bibliography)). But the underlying article *itself* does not appear to have been filed in this case.

like presentation) promoting an autoimmune, cross-reactive attack on CNS spinal cord tissue myelin. *Id.* at 38–39. All of the above also likely aggravated her existing, subclinical process that would later manifest as MS, due to "secondary, autonomous CNS inflammation." *Id.* at 39.

Dr. Tornatore also devoted some of his first report to delineating the basis for his opinion that the timeframe from vaccination to onset was medically acceptable. First Tornatore Rep. at 39–41. He noted that it was difficult to identify "risk intervals," given the rarity of "vaccine-precipitated TM." *Id.* at 39. But (citing a publication by the Institutes of Medicine ("IOM")) he observed that the known timeframes for the adaptive immune response to a foreign antigenic stimulus provided a reasonable framework that could be relied upon in this context. *Id*; 2012 IOM Report at 58. Here, an immune response could be evident within up to three days of vaccination—and an article specific to a different CNS-impacting demyelinating disease (acute disseminated encephalomyelitis, or "ADEM") established that a two-to-28-day timeframe was a likely risk interval post-vaccination. A. Rowhani-Rahbar et al., *Biologically Plausible and Evidence-Based Risk Intervals in Immunization Safety Research,* 31 Vaccine 271–77 (2012), filed as Ex. 52 (ECF No. 60-8) ("Rowhani-Rahbar"). And articles involving flu vaccine-associated peripheral neuropathies reached a comparable conclusion. L. Schonberger et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976-1977,* 110 Am. J. Epid. 2:105–23 (1979), filed as Ex. 53 (ECF No. 30-5) ("Schonberger"). As a result, Petitioner's onset (which he proposed occurred 11 to 15 days post-vaccination) fit well within these intervals. First Tornatore Rep. at 41.

*Second Report*

Dr. Tornatore offered a concise supplemental expert report, responding to the points and objections raised in the report of Respondent's expert, Dr. Matthew Brier. First, he highlighted two important areas of agreement between them: both accepted that the MS diagnosis was appropriate, and that Petitioner had possessed "asymptomatic demyelinating lesions" pre-vaccination—meaning she could be properly said then to have been experiencing "Radiologically Isolated Syndrome," or "RIS,"[18] before she was later diagnosed with MS. Second Tornatore Rep. at 1–2. But Dr. Tornatore denied that RIS was equivalent to MS, noting instead that those deemed to display RIS were only at *risk* of later developing clinically-manifest MS (something reflected in studies Respondent had relied upon). *Id.* at 1, 2; *see also Radiologically Isolated Syndrome (RIS),* MS Society (last visited Sept. 2, 2026), https://www.mssociety.org.uk/about-ms/types-ms/radiologically-isolated-syndrome-ris-and-ms (the "MS Society Webpage"). (Notably, however, the portion of the MS Society Webpage that Dr. Tornatore opted to republish in his report does not identify any intervening environmental factors—like a vaccine—as likely to provoke RIS

[18] Radiologic Isolated Syndrome, or "RIS," is "used to explain circumstances where an individual displays evidence of brain or spine lesions on an MRI but has no outward clinical manifestations of neurologic disease." *Samuels v. Sec'y of Health & Hum. Servs.*, No. 17-071V, 2020 WL 2954953, at n.11 (Fed. Cl. Spec. Mstr. May 1, 2020).

into clinical MS, and instead identifies concurrent risk factors, like age, location of lesions, or CSF testing results. Second Tornatore Rep. at 2).

Petitioner's RIS was, in Dr. Tornatore's view, nevertheless likely sparked into transition to clinical MS by the flu vaccine she received. Second Tornatore Rep. at 2. In so arguing, Dr. Tornatore again referenced certain clinical findings as establishing "vaccine-induced immune activation which was beyond that seen in MS relapses," and instead consistent with an external trigger. *Id.* at 2, 4–5. Studies had recognized that vaccination could increase monocytosis, within a timeframe comparable to what Petitioner had experienced. *Id.* at 4; S. Mohanty et al., *Prolonged Proinflammatory Cytokine Production in Monocytes Modulated by Interleukin 10 After Influenza Vaccination in Older Adults*, 211 J. Infectious Diseases 1174, 1176 (2015), filed as Ex. 56 (ECF No. 65-3). This monocytosis would not, however, reflect an MS relapse/symptom that would occur absent a "preceding immune-activating event"—here, receipt of the flu vaccine. Second Tornatore Rep. at 4. (Importantly, however, the testing that revealed these allegedly-alarming monocyte levels occurred around October 13, 2019—nearly three weeks post-vaccination, with no prior evidence of an unusual post-vaccination inflammation).

Petitioner's reported fevers and night sweats were also factors supportive of a vaccine-induced process. These kinds symptoms did not look, in Dr. Tornatore's view, like MS relapse symptoms absent a "prior immune stimulating event." Second Tornatore Rep. at 6. Only the prior vaccination could explain them (and in fact fever was widely recognized as a vaccine-associated side effect). *Id.* (citing flu vaccine package insert).

Relatedly, Dr. Tornatore devoted a portion of his second report to revisiting the concept of Uhthoff's phenomena and its connection to his theory. As Dr. Tornatore observed, Dr. Brier had agreed that certain kinds of indirect immune-stimulated conditions (for example, a vaccine-induced fever) could lead to "recrudescence" of MS symptoms, i.e. a flare, consistent with Uhthoff's phenomena. Second Tornatore Rep. at 7. Dr. Brier denied that a patient's overall MS course would be impacted absent new lesions (which would not be sparked by such outward clinical symptoms). But a particular study (albeit more than 50 years old, and involving temperature stimulus only due to a hot bath) filed by Dr. Brier in fact determined that "de novo" inflammation was possible due to Uhthoff's phenomena. *See* J. Berger et al., *Persistent Neurological Deficit Precipitated by Hot Bath Test in Multiple Sclerosis*, 249 JAMA 1751, 1752 (1983), filed as Ex. A-2 (ECF No. 62-3) ("Berger").

Dr. Tornatore also reiterated his view that the initial negative finding of oligoclonal bands in CSF testing results (with the bands only being observed two months later) was supportive of a vaccine-induced process. Second Tornatore Rep. at 3–4. He deemed the vaccine to have promoted the production of certain IgG antibodies akin to oligoclonal bands, that in turn could have encouraged later oligoclonal band production intrathecally (meaning within the CNS). *Id.*,

referencing Beseler at 9, 10. (Dr. Tornatore did not, however, provide a more detailed explanation for why or how antibodies triggered by vaccination would pierce the blood-brain barrier).

Another issue that Dr. Tornatore deemed significant in determining causation was the spinal-focused myelitis Petitioner unquestionably had experienced. Second Tornatore Rep. at 5. While Dr. Brier viewed Petitioner's TM-like early clinical symptoms as just reflecting the "natural history" of the MS she went on to develop, evidence filed in this matter by Respondent noted that the first situs of an MS-related inflammatory event "may influence the location of subsequent attacks." *Id.*; E. Tsantes et al., *Location of First Attack Predicts the Site of Subsequent Relapses in Multiple Sclerosis*, 74 J. of Clinical Neuroscience 175 (2020), filed as Ex. A-17 (ECF No. 62-18) ("Tsantes") (involving 199 patients, 148 of whom the authors could clearly define the precise attack location, and finding that in approximately 47%, "the second attack involved exactly the same location as the first" relapse). Tsantes noted that "the pattern of lesion distribution in MS patients might be closely related to the antigen specificity of encephalitogenic T-cell response." Tsantes at 178. From this (and concurrently relying on his arguments about antigenic similarity between flu vaccine components and "CNS myelin-related epitopes"), Dr. Tornatore deemed it likely that the earlier, presumably vaccine-induced spinal cord inflammation could be "recapitulated" later. Second Tornatore Rep. at 5.

(This argument, however, seems to conflate Tsantes's point about the foci in the CNS for symptomatic *secondary* relapse with what might cause a first relapse—and otherwise seems aimed again at outlining how a vaccine could cause a myelitis-like presentation that would later reflect the start of MS, but without also proving that the immune stimulation of a vaccine is understood possibly to *cause* MS in the first place—a contention Petitioner and her expert studiously endeavor to skirt).

Dr. Tornatore also made a number of incidental points in response to Dr. Brier's contentions. He again proposed, for example, that epidemiologic evidence was incapable of ruling out the rare event of a vaccine-caused injury (implicitly rejecting such evidence as having probative value in this case). Second Tornatore Rep. at 2–3. He contended that there was direct research evidence establishing that "rare heterogeneous" responses to vaccine existed, regardless of epidemiologic proof, and thus it was more than a hypothesis for Dr. Tornatore to propose that cytokines like gamma interferon could possibly medicate vaccine-induced CNS autoimmune processes. *Id.* at 6–7. And he noted that Dr. Brier had not contested the findings of studies like Bielekova, which observed (in the context of EAE studies highly relevant to MS) that stimulation of an autoimmune response against CNS myelin (resulting in symptoms worsening) was possible via direct "immunization" of APLs known to have homologic similarity with CNS peptides. *Id.* at 7–8.

B. Respondent's Expert – Dr. Matthew Brier

Dr. Brier, a neurologist, filed a single report in this matter for Respondent. Report, dated Mar. 28, 2025, filed as Ex. A (ECF No. 62-1) ("Brier Rep.").

Dr. Brier attended the University of Texas for his undergraduate degree, and Washington University, St Louis for his medical degree and Ph.D. Curriculum Vitae, filed as Ex. B (ECF No. 62-19) ("Brier CV"). He then completed an internship followed by his residency in Neurology at Barnes Jewish Hospital in St. Louis, Missouri. Brier CV at 1; Brier Rep. at 1. Thereafter, Dr. Brier completed a fellowship in Multiple Sclerosis and Neuroimmunology at Washington University School of Medicine, where he is currently an Assistant Professor of Neurology and Radiology. Brier CV at 2. He is board certified by the American Board of Psychiatry and Neurology. *Id.* at 3. Dr. Brier's sub-specialty training is in neuro-immunology, which includes MS and related conditions, as well as their common presentations such as TM. Brier Rep. at 1.

Like Dr. Tornatore, Dr. Brier provided his own summary of Petitioner's medical history before setting forth his primary opinions. Brier Rep. at 2–4. He concurred with Dr. Tornatore's view that Petitioner had properly been diagnosed with MS (specifically the relapsing-remitting form), and that "the pathological process began before the vaccination in question." *Id.* at 4. He defined this MS variant to feature "clinical attacks, or relapses, corresponding to focal demyelination (lesions) within the central nervous system (brain or spine)." *Id.* But lesions did not always result in symptoms, but could instead remain silent before the "sentinel event" of a first symptom, with older lesions then visible when imaging was performed in response to treatment efforts to diagnose the problem. *Id;* R. Fox & J. Cohen, *Multiple Sclerosis: The Importance of Early Recognition and Treatment*, 68 Cleveland Clinic J. of Med. 157, 163 (2001), filed as Ex. A-5 (ECF No. 62-6).

Petitioner's initial presentation (as of mid-October 2019) was fully consistent with an MS diagnosis (albeit requiring confirmation later by a second symptom "implicating a different CNS site").[19] Breier Rep. at 5; A. Thompson et al., *Diagnosis of Multiple Sclerosis: 2017 Revisions of the McDonald Criteria*, 17 Lancet Neurol 162, 167 (2018), filed as Ex. A-14 (ECF No. 62-15). Although she had experienced only one neurologic "attack," imaging also revealed more than two lesions (some enhancing, some not)—and thus it did not matter that she did not initially *also* display the oligoclonal bands biomarker associated with MS (although she later did). Brier Rep. at 5. But Dr. Brier firmly favored the view that regardless of when oligoclonal bands appeared in this particular case, Petitioner's disease process was well underway before vaccination, noting that "the disease process we call MS begins years prior to the first clinically recognized attack." *Id.* Thus,

[19] When an MS diagnosis is at issue, this can be characterized as the need for evidence of "dissemination in time and space"—meaning more than one symptom and/or lesion, discovered or revealed at different temporal moments, rather than a monophasic and acute one-time event. *Hunt v. Sec'y of Health & Human Servs.*, No. 12-232V, 2015 WL 1263356, at *11 (Fed. Cl. Spec. Mstr. Feb. 23, 2015), *mot. for review den'd*, 123 Fed. Cl. 509 (2015).

"the occurrence of the first symptoms does not represent a significant change in the ongoing underlying pathophysiology," even if it is the first outward/clinical manifestation. *Id.*

Dr. Brier did not deem initial treater views that Petitioner might have TM, based on her original presentation, to be meaningful, whether for purposes of her ultimate MS diagnosis or as independently supportive of vaccine causation. Rather, those treaters were responding in real time to "evolving information." Brier Rep. at 5. Moreover, he noted that TM was not necessarily a meaningful diagnosis generally; since it reflects the existence of inflammatory damage to the spinal cord, from a diagnostic standpoint a treater should ask in its presence, "'TM due to what?'" *Id.* TM-like presentations could reflect the first instance of a variety of distinguishable disease processes (MS, NMO, myelin oligodendrocyte glycoprotein antibody-associated disease), or could simply be the result of an infection or idiopathic process. *Id.* at 5, 6. Here, however, Petitioner's course over time revealed that "the MS caused the TM"—and as a result, it was "inappropriate to lump all causes of TM in with the known specific cause" in this case. *Id.* at 6 (analogizing that data relating to the impact of a sunburn on skin was not relevant to poison ivy's causal features, even though both result in "red skin").

Also significant, Dr. Brier contended, was medical science's understanding of how MS progresses from a subclinical condition (which can be inadvertently revealed by imaging) into a "clinically apparent" condition. Brier Rep. at 6. RIS, he stated, "refers to the pre-symptomatic phase of MS wherein lesions accumulate but no symptoms are present." *Id.* Certain recent studies have looked to evaluate whether some treatments might successfully "delay" MS's progress from subclinical to outward symptoms manifestation. C. Lebrun-Frénay et al., *Teriflunomide and Time to Clinical Multiple Sclerosis in Patients with Radiologically Isolated Syndrome, The TERIS Randomized Clinical Trial*, 30 JAMA Neurol 1080 (2023), filed as Ex. A-8 (ECF No. 62-9) ("Lebrun-Frénay"). That study applied a three-year period of observation to an 89-patient sample, approximately half of whom received the medication that was theorized to delay clinical onset (with the other half receiving a placebo). Lebrun-Frénay at 1082. Over the timeframe at issue, about half of the untreated group still went on to manifest symptoms sufficient to formally diagnose them with MS. *Id.*

A similar study employing a different medication reached the same result, i.e., that "the untreated RIS group was at high risk of a clinical relapse over the course of the study." Brier Rep. at 7; D. Okuda et al., *Dimethyl Fumarate Delays Multiple Sclerosis in Radiologically Isolated Syndrome*, 93 Ann Neurol 604 (2023), filed as Ex. A-11 (ECF No. 62-12) ("Okuda"). Thus, individuals who could be said to be "experiencing" subclinical MS were at a significant risk of developing clinical manifestations later—no matter what steps were taken to arrest disease progression. In fact, Dr. Breier maintained, the risk of "conversion" to clinical MS was even higher when imaging revealed (as here) "the presence of cervical or thoracic spinal cord lesions." Brier Rep. at 8; P. Preziosa et al., *Radiologically Isolated Syndromes: To Treat or Not to Treat?*, 271 J.

of Neurology 2370 (2024), filed as Ex. A-13 (ECF No. 62-14) ("Preziosa"). In effect, the fact that Petitioner likely possessed lesions prior to onset reflective of MS rendered her a "ticking time bomb" capable of later developing clinically-evident, diagnosable MS. Brier Rep.at 8, 13.

Dr. Brier discounted the role of the flu vaccine in hastening this progression toward Petitioner's clinical MS. Brier Rep. at 8–9. He acknowledged the absence of any direct, randomized control trial-type studies regarding the causal potentiality of MS due to receipt of a flu vaccine, but emphasized that studies *did exist* as to the risk of vaccination worsening MS/causing symptoms relapse.[20] *Id.* at 8. One such study (albeit involving data from 1993) found no increased exacerbation risk post-vaccination, or any disease course change. A. Miller et al., *A Multicenter, Randomized, Double-Blind, Placebo-Controlled Trial of Influenza Immunization in Multiple Sclerosis*, 48 Neurology 312 (1997), filed as Ex. A-9 (ECF No. 62-10) ("Miller"). Other, more recent studies (some of which were admittedly observational, and hence akin to case series reports) had reached similar conclusions (and specifically with respect to relapses impacting the spinal cord). *See, e.g.,* R. Baxter et al., *Acute Demyelinating Events Following Vaccines: A Case-Centered Analysis,* 63 Clinical Infectious Diseases 1456 (2016), filed as Ex. A-1 (62-2) ("Baxter"). Thus, in Dr. Brier's opinion, the flu vaccine Petitioner received "did not change her already high odds of having a relapse,[21] and she went on to have the relapse leading to her diagnosis of MS." Brier Rep. at 9.

In a broader sense, Dr. Brier argued, it was not all that likely that *any* "external factors" could aggravate subclinical MS. Brier Rep. at 11–12. Dr. Tornatore had, for example, proposed that a cytokine (gamma interferon) had the capacity to instigate MS symptoms relapses (and in turn that vaccination-induced production of these cytokines would link the vaccine to the relapse). *Id.* at 12. Dr. Brier characterized this argument as a "reasonable hypothesis," but noted that it had been "implicitly" tested in studies focusing on vaccination, like Miller, and not confirmed. Since the flu vaccine had not itself been shown to likely cause MS symptoms relapse, the tendency of vaccines to upregulate this class of cytokine had no bearing on causation.

---

[20] Dr. Brier also noted a "predictable criticism" of studies undermining causation that petitioners and their experts often raise: that sample sizes (even in very large studies) are too small to give them weight, or that the rarity of vaccine injuries renders causality undetectable through epidemiology. Brier Rep. at 8. He deemed such objections "not license" to rely on case reports "prone to ascertainment bias," subject to chance, or which themselves are not methodologically well-constructed. *Id.* Dr. Brier's argument is exceedingly well-taken, and reflects a point I have made time and again when petitioners similarly attempt to evade the facial findings of epidemiologic studies by ruling out categorically their evidentiary value.

[21] In using the term" relapse," Dr. Brier noted that "[t]he transition from pre-clinical (asymptomatic) MS to clinical MS (equivalently, the transition from RIS to MS) is defined by a relapse." Brier Rep, at 8. Thus, even though Petitioner's initial post-vaccination symptoms were the first outward clinical manifestation of her MS, they would be considered, medically, as a "relapse."

Dr. Brier similarly rejected the argument that the demonstrated existence of Uhthoff's phenomenon suggested how a vaccine might impact an existing case of MS. Dr. Brier allowed that receipt of a vaccine could have transient impacts (such as due to a fever sparked by vaccination) that would worsen MS symptoms, even in a context of otherwise-"silent" lesions. Brier Rep. at 12. But those symptoms would "resolve after the stimulus is removed." *Id.* Dr. Brier did not accept Dr. Tornatore's contention that the symptoms could worsen MS's course, however, noting that the article observing this proposition was from 1983, and mainly discussed the risks of a diagnostic test involving exposing patients to high heat that had been supplanted by imaging. *Id.* Dr. Brier also proposed that the worsening observed in Berger was likely due primarily to *new* lesion activity—which the record showed Petitioner had in fact been experiencing around the time of onset (as captured on MRI). *Id;* Berger at 2. Dr. Brier thus distinguished between transient symptoms flares that do not persist, regardless of their trigger, and true MS progression, which would likely be attributable to lesion activity.

The remainder of Dr. Brier's report responded to a number of Dr. Tornatore's individual contentions or assumptions. Brier Rep. at 9–13. Generally, Dr. Brier disagreed with Dr. Tornatore's characterization of Petitioner's medical history as presenting an "unusual case." *Id.* at 9. He allowed that Petitioner's experience might not be a "textbook example" of how MS often presents, but it was nevertheless not "outside the norms" for MS either. *Id.*

Thus, Dr. Tornatore had emphasized the fact that at the time of Petitioner's initial clinical symptoms onset, testing had not detected the presence of oligoclonal bands. But Dr. Brier in response cited a study attempting to evaluate the possibility that an individual would develop diagnosable MS after displaying only a single "attack."[22] Brier Rep. at 9. M. Tintore et al., *Defining High, Medium and Low Impact Prognostic Factors for Developing Multiple Sclerosis*, 138 Brain 1863 (2015), filed as Ex. A-15 (ECF No. 62-16) ("Tintore"). Tintore considered a sample of more than one-thousand patients who (between 1995 and 2013) had experienced one MS-like clinical symptom over a mean period of 81 months, with an eye toward evaluating their risk of a second attack (sufficient for the MS diagnosis). Tintore at 1866. While a majority of the studied sample fit the diagnostic criteria for MS, only 57 percent of the group displayed oligoclonal bands. *Id.* From this, Dr. Brier concluded that the absence of oligoclonal band findings occurs "in a significant fraction of early MS presentations," but they will later be observed in subsequent CSF testing. Brier. Rep. at 10.

Dr. Brier also discounted the significance of the fact that Petitioner's presentation initially featured primarily "spinal cord pathology." Brier Rep. at 10. He admitted that other presentations—optic neuritis or "brain stem" issues—were slightly more common initially, but

[22] Dr. Brier referenced here the concept of "clinically isolated syndrome," or "CIS"—where an individual experiences an MS-like symptom once, but without the "dissemination in time" required to formally corroborate the diagnosis. Brier Rep. 9.

noted that the percentage of patients who (like Petitioner) presented with spinal cord issues was still about one-fourth overall. Tintore at 1866. Otherwise, there was no predominating form of presentation, and in Dr. Brier's view "the fact that this presentation [in this case] confused the clinical picture early is irrelevant." Brier Rep. at 11.

Other aspects of Petitioner's initial symptoms or test results were not viewed by Dr. Brier as suggesting anything unexpected in the transition from subclinical MS to something that would meet the clinical diagnosis. Dr. Brier deemed evidence that Petitioner may have experienced some post-onset fevers or night sweats to be subjective symptoms that were "non-specific," and hence not etiologically significant. Brier Rep. at 11. He also considered the CSF testing evidence of monocytosis in the medical record as establishing only "weak leukopenia," which in fact later was shown to have resolved. *Id.* (*citing* Ex. 5 at 291). Hence, this finding was also not a "clinically significant abnormality." *Id.*

Finally, Dr. Brier did not give great weight to Dr. Tornatore's arguments about the significance of Petitioner's LETM in corroborating vaccine causation. Brier Rep. at 12–13. In fact, Dr. Brier denied Petitioner *had* experienced LETM. He noted that LETM's definition required proof of lesions extending over three or more vertebral segments. C. Trebst et al., *Longitudinal Extensive Transverse Myelitis—It's Not all Neuromyelitis Optica*, 7 Nat. Rev. Neurol. 688 (2011), filed as Ex. A.-16 (ECF No. 62-17). But Petitioner's imaging had clearly revealed no lesions extending more than two segments (and an alternative view was only possible if lesions between cervical or thoracic spinal regions were collapsed into one). Brier Rep. at 13*;* Ex. 8 at 9–10; 17–18. Otherwise, evidence pertaining to LETM causation was irrelevant, since "more often than not the LETM is due to a distinct condition and not MS." Brier Rep. at 13. LETM was more consistent with distinguishable CNS neuroinflammatory conditions, like myelin oligodendrocyte glycoprotein-associated disease ("MOGAD") or neuromyelitis optica. *Id.* Thus, evidence discussing LETM's association with certain infections or vaccinations did not bear on this matter.

## III. Medical and Scientific Literature

Ample Program authority establishes that special masters are not required to describe and/or analyze in a written decision every item of literature filed in support of or against a claim. *Snyder v. Sec'y of Health and Hum. Servs.*, 36 Fed. Cl. 461, 466 (1996), *aff'd*, 117 F.3d 545 (Fed. Cir. 1997). Indeed, the failure to specifically mention a filed item in a decision does not allow for the inference that it was ignored in the special master's overall weighing of evidence. *Hazlehurst v. Sec'y of Health and Hum. Servs.*, 604 F.3d 1343, 1352 (Fed. Cir. 2010) (noting that a reviewing court presumes that the fact finder has considered all of the material in the record, regardless of whether it is individually mentioned in his or her decision); *see also Moriarty v. Sec'y of Health & Hum. Servs.,* No. 2015–5072, 2016 WL 1358616, at *5 (Fed. Cir. Apr. 6, 2016) ("[w]e generally presume that a special master considered the relevant record evidence even though he does not

explicitly reference such evidence in his decision") (citation omitted); *Paterek v. Sec'y of Health & Hum. Servs.,* 527 F. App'x 875, 884 (Fed. Cir. 2013) ("[f]inding certain information not relevant does not lead to—and likely undermines—the conclusion that it was not considered").

In my review of the expert opinions filed in this matter, I have discussed some articles they referenced and/or filed that are significant to my analysis or the parties' positions—but not all (and I do not intend to exhaustively address all 38 items filed by Petitioner). I note, however, that 21 items filed in this case were *also* offered in a parallel case I decided last year involving the flu vaccine's alleged capacity to cause MS, *Peterson v. Sec'y of Health & Hum. Servs.,* No. 22-322V, 2025 WL 3269458, at *4–12, 17–18, 28–29 (Fed. Cl. Spec. Mstr. Oct. 30, 2025) (discussing items of literature also filed in this matter). That matter similarly featured several lengthy expert reports penned by Dr. Tornatore, who not only cited these same items of literature but in many cases employed the same descriptive verbiage in his reports in discussing them. This underscores the extent to which I am fully familiar with the kinds of arguments made by experts in an effort to associate the flu vaccine with MS.

## IV. Procedural History

This case was initiated in April 2022, and at that time Petitioner was represented by different counsel. After the case was assigned to me, I held a status conference—and informed Petitioner right away that my prior experience with comparable cases suggested that a Vaccine Act claim that the flu vaccine can cause MS was unlikely to succeed. *See* Scheduling Order, dated July 28, 2022 (ECF No. 16). I therefore instructed Respondent to consider seeking dismissal of the claim after medical review and the filing of the Rule 4(c) Report, and Respondent did so in December 2022.

Thereafter, prior counsel withdrew from the case, and for a lengthy period of time it was a *pro se* matter until present counsel appeared in June 2023 (ECF No. 36). After holding a status conference, I reset the deadline for Petitioner's response to the pending motion to dismiss, and Petitioner filed her brief at the end of September 2023.

Respondent's Rule 4(c) Report had opposed an award of compensation, arguing that it is unlikely the flu vaccine can cause MS—the proper, ultimate diagnosis applicable to Petitioner, as the medical record indicates. Rule 4(c) Report, dated December 1, 2022 (ECF No. 20).[23] I later informed Petitioner that although I doubted that my concerns about the claim's viability could be overcome, I would allow her the opportunity to set forth arguments against dismissal. After review of those filings I dismissed Petitioner's claim, concluding that while her medical records supported

[23] Filed concurrently with the Rule 4(c) Report was Respondent's Motion to Dismiss—but the latter is a one-page document that contains no specific arguments separate from the Rule 4(c) Report. I therefore treat the Rule 4(c) Report herein as Respondent's actual "motion," since it sets forth the substantive grounds offered for dismissal.

the ultimate MS diagnosis, she had failed to establish "an association between [her] medical issues and her receipt of the flu" either through direct evidence or through the opinions of her treating physicians. *See* Entitlement Decision, dated Apr. 1, 2024 (ECF No. 41) ("Decision"), set aside and remanded.

Petitioner moved for review of my decision on April 23, 2024, requesting that the Court "set aside the decision and remand the case to a different Special Master for further consideration." *See* Motion for Review, dated Apr. 23, 2024 (ECF No. 42) (Mot. for Rev.") at 8. Specially, she argued that I abused my discretion by denying her the ability to develop and present her case, that I prejudiced her by an improper application of the issue preclusion, and therefore, denied her a full and fair opportunity to present her case as required by the Act, and that I erred in failing to provide a sufficient record to permit review under Section 3(b)(2). Mot. for Rev. at 8.

Following oral argument on the motion for review, the Court of Federal Claims issued an order granting Petitioner's Motion for Review. *See generally* Remand Order. In it, the Court held that Petitioner should have the chance to submit an expert report. *Id.* at 23. It was further stated, however, that "[n]othing in th[e] opinion should be read to preclude [the special master] from coming to the same conclusion in this case after looking at all the evidence," and/or determining what weight to give any expert report filed by Petitioner. *Id.* (internal citations omitted).

On Remand, Petitioner filed the two aforementioned reports from Dr. Tornatore, along with supporting medical literature, and Respondent offered Dr. Brier's report. Thereafter, I directed the parties to file briefs addressing their respective positions, and the matter is now ripe for resolution.

## V. Parties' Arguments on Remand

As noted above, the parties do not dispute MS as Petitioner's appropriate diagnosis, and further agree that "the pathological process" for her MS "began before the vaccination in question." Brier Rep. at 4; *see also* First Tornatore Rep. at 10–11.

*Petitioner*

Petitioner begins by highlighting the fact that she presented with TM following receipt of the flu vaccine, maintaining that vaccination "significantly aggravated her underlying asymptomatic demyelinating condition in a manner that was clinically consistent with TM, which eventually evolved into MS." Mot. at 16. (Her brief carefully avoids terming this "underlying asymptomatic demyelinating condition" as subclinical MS, however—even though the record preponderantly establishes that this "condition" *was* subclinical MS, and not some inchoate general demyelinating condition that might have gone in some other direction).

She then goes on to discuss each prong for a significant aggravation claim under *Loving v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 135 (2009). As to the first *Loving* prong, Petitioner maintains that there is no evidence to suggest that she experienced any neurologic illness or symptoms, and that her pre-vaccination history was only notably for other non-related issues. Mot. at 15; Ex. 4 at 5–6. She also notes that none of her treating physicians at Brooklyn Hospital Center considered her pre-vaccination history when evaluating her demyelinating symptoms. Mot. at 15. Moreover, during Petitioner's October 13, 2019, neurological consult, she reported that her complained of numbness never occurred before, and she further denied having any recent trauma, travel, chest pain, headache, neck pain, dizziness, or changes in medication. *Id.*; Ex. 5 at 12. Thus, she contends she has provided preponderant evidence demonstrating her condition prior to the receipt of the vaccination at issue. (This argument, of course, ignores the preponderantly-established likelihood that Petitioner was experiencing a subclinical process leading to MS pre-vaccination).

For *Loving* Prong Two, Petitioner notes that approximately fourteen days post-vaccination she began to experience bilateral numbness in her lower extremities, and four days thereafter, she presented to Brooklyn Hospital Center where she remained inpatient until October 20, 2019. Ex. 4 at 5. Following her discharge, Petitioner maintains she continued to experience numbness, urinary urgency, trouble with memory and intermittent poor sleep quality, as well as required the use of a walker. Ex. 8 at 35, 42; Ex. 2 at 1. As to the latest medical record from July 2021, Petitioner reported that her symptoms remained largely unchanged, and to this day she continues attending PT to improve numbness and tingling in her lower extremities. Ex. 13 at 46–47.

Petitioner next argues that *Loving* Prong Three has been satisfied herein. Mot. at 16. Prior to the vaccination at issue, she was not only able to work, but she had no significant medical history, and the record is wanting with documentation that her asymptomatic condition had manifested any symptoms. *Id.*; Ex. 2 at 2, 1. But approximately two weeks post-vaccination, Petitioner reported bilateral numbness from her lower extremities upward, which then caused an inability to walk without assistance. *Id.* Thus, she maintains that the medical records "clearly demonstrate" that her health condition prior to the flu vaccine significantly worsened following vaccination. Mot. at 16.

With respect to *Loving* Prong Four (which corresponds to the first causation prong set in the Federal Circuit's decision of *Althen v. Sec'y of Health & Hum. Servs.,* 418 F.3d 1274, 1278 (Fed. Cir. 2005), Petitioner reiterates the main components of Dr. Tornatore's causation theory, which relies on five factors: (1) a pre-existing demyelinating condition can be significantly aggravated by external factors; (2) components of the flu vaccine can trigger central nervous system demyelination with prominent myelitis through molecular mimicry; (3) medical literature demonstrates that vaccinations can result in TM; (4) a peripheral inflammatory event can trigger an immune response that results in a central nervous system inflammatory event; and (5) a single

immunization can lead to a progressive inflammatory disorder. *See generally* Mot. at 17–25. In sum, Petitioner argues that she has provided sufficient preponderant evidence that the flu vaccine could cause the significant aggravation of her asymptomatic spinal cord lesions. *Id.* at 24. She further contends that "definitive proof of th[ese] mechanisms is not required," and that she need only provide "a biologically plausible theory" supported by "sound and reliable medical or scientific explanation." *Id.* at 25; *see also Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1375, 1378–79 (Fed. Cir. 2009); *Knudsen v. Sec'y of Health & Hum. Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994).

Petitioner then turns to *Loving* Prong Five/*Althen* Prong Two—noting that the medical records and literature sufficiently demonstrate that her clinical presentation "fully aligns with the theory proposed by Dr. Tornatore." Mot. at 25. The medical records indicate that she had pre-existing asymptomatic spinal cord lesions prior to vaccination, including CSF results revealing no oligoclonal bands even 25 days after receiving the flu vaccine. *Id.* Moreover, Petitioner explains that "most of her lesions did not enhance with gadolinium, which means that the visualized lesions were at least [two] to [three] weeks old—i.e. from *before* her vaccination." *Id.*; First Tornatore Rep. at 11; Exs. 21–22. Following vaccination, however, her symptoms worsened due to the external stimulus of vaccination. In support of that potentiality, Petitioner proposes three examples of how this might occur (i.e. Uhthoff's Phenomenon, exposure to gamma-interferon, or exposure to APLs of MBP), although she concedes that there is no medical record evidence for the latter two. Mot. at 25. Nevertheless, Petitioner contends that her overall clinical presentation or symptoms course is consistent with the proposed theory, and she has therefore demonstrated a logical sequence of cause and effect showing that the flu vaccine was the reason for her significant aggravation. *Id.* at 26.

Finally, Petitioner relies on the 2012 IOM Report, as well as other studies, as support for satisfying her burden under *Loving* Prong Six/*Althen* Prong Three—all of which suggest that "a biologically appropriate interval for an aberrant vaccine-mediated immune response resulting in CNS injury is 1 – 42 days." Mot. at 26, 27. Here, Petitioner received the vaccine at issue on September 25, 2019, and had relevant symptoms manifest eleven to fifteen days post-vaccination. Therefore, she maintains that her clinical onset is "well within the accepted risk intervals" noted by the IOM and in the Shoenberger study. *Id.*at 27.

In her reply, Petitioner briefly addresses again her showing with respect to the six *Loving* Prongs. *See generally* Reply at 2–6. As to the first three, Petitioner reiterates she had no prior medical history for neurologic illness or symptoms. *Id.* She then argues Respondent "concedes" that "[her] MS symptoms were subclinical prior to October 2019 and manifested clinically after October 2019," and thus, because she "had no symptoms or experience of MS prior to her vaccination, and after [ ] vaccination she developed full blown MS requiring nerve pain

medication, PT and numerous other treatments" she has satisfied her burden under *Loving* Prongs One–Three. *Id.* (citing Opp. at 17).

For the next three *Loving* prongs, Petitioner briefly addresses each, and their corresponding *Althen* prong. Petitioner argues that Respondent has "impermissibly elevate[d] [her] burden to a degree of scientific certainty and general acceptance in the medical community" as he "repeatedly mischaracterized [her] argument by conflating her theory of causation with the sound reliable medical and scientific explanation in support of the theory, …" Reply at 2, 3. In response, Petitioner states that "[a] medical theory is simply the expert's explanation for what happened" and "[i]t is not imbued with any specific scientific requirement." *Id.* at 3. She further notes, however, that proposed mechanisms may be relied upon as part of the explanation in support of a theory, but that the failure to prove a biological mechanism "may not be used to rule against Petitioner or to preclude a finding in favor of Petitioner." *Id.* Nevertheless, Petitioner contends that, through her expert's opinion and supporting medical literature, she has preponderantly demonstrated that the flu vaccine could cause her significant aggravation." *Id.* at 5.

Lastly, she reiterates that her clinical presentation is consistent with Dr. Tornatore's proposed theory of causation, but that it was also consistent with the filed literature regarding a medically appropriate onset. *Id.* at 6. Accordingly, Petitioner maintains she has met her burden under *Loving* and *Althen*. *Id.*

*Respondent*

Respondent emphasizes that the parties do not dispute MS to be Petitioner's appropriate diagnosis, and further agree that "the pathological process" for her MS "began before the vaccination in question." Brier Rep. at 4; *see also* First Tornatore Rep. at 10–11. He also acknowledges that Petitioner initially alleged a causation-in-fact claim, but that the formulation of the claim as it presently stands is whether Petitioner's receipt of the flu vaccine likely significantly aggravated her pre-existing, but subclinical, MS. Opp. at 16–17.

Respondent contends that Petitioner has failed to demonstrate that she meets the *Loving* criteria. Opp. at 17. First, he maintains that she has not provided preponderant evidence establishing satisfaction of the first three *Loving* prongs: "(1) [her] condition prior to administration of the vaccine, (2) [her] condition (or the condition following the vaccination if that is also pertinent), [and] (3) whether [her] current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination." *Loving,* 86 Fed. Cl. at 144. Based on the filed record, Respondent argues there is insufficient evidence supporting the contention that Petitioner's condition materially worsened post-vaccination beyond the natural progression of her condition, and therefore, she has failed to demonstrate significant aggravation. Opp. at 17. In so arguing, Respondent relies on Dr. Brier's opinion that "[P]etitioner had RIS prior to vaccination, [which]

over half of patients with RIS, when left untreated, experience a clinical relapse [and] that number is greater when the lesion in question is in the cervical or thoracic spinal cord, as [herein].” Brier Rep. at 6–8.

Similarly, the evidence suggesting that the flu vaccine has any impact on the progression of MS is lacking. Opp. at 18. To bulwark this point, Dr. Brier relies on Miller—which looked at 104 patients across five MS centers, and where patients were randomized to receive either a standard flu vaccine (49 patients) or a placebo injection (54 patients). Miller at 1–2. The authors concluded that receipt of the flu vaccine was not associated with an increased risk of MS exacerbation. *Id.* at 2–3. Dr. Brier even went so far as to describe the Miller study as the “standard for evidence generation” due to its ability to evaluate or establish causation and “remove the confound of chance occurrence which plagues case studies and case series.” Opp. at 19 (citing Brier Rep. at 8). Thus, Respondent argues that the medical literature supports the proposition that Petitioner’s disease course would have likely progressed from asymptomatic to clinically significant on its own and further emphasizes the “high-quality evidence” suggesting no association between the flu vaccine and an increased risk in MS exacerbation. Opp. at 19, 20–21 (observing that the Federal Circuit has upheld Program decisions that found no preponderant evidence of a connection between the flu vaccine and aggravation of MS).

Respondent also briefly criticizes Petitioner’s assertion that she need only provided a *biologically plausible* medical theory—noting that “[p]lausibility is not the correct standard of proof for the first prong of the *Althen* analysis.” Opp. at 20. Indeed, Respondent emphasizes the Federal Circuit’s repeated affirmance that preponderance of the evidence is the appropriate standard—most recently in *Cerrone v. Sec’y of Health & Hum. Servs.*, 146 F.4th 1113, 1121 (Fed. Cir. 2025). There the Federal Circuit stated that “we have repeatedly stated that ‘simply identifying a ‘plausible’ theory of causation is insufficient for a petitioner to meet her burden of proof.” *Id.* (citing *LaLonde v. Sec’y of Health & hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014)). Respondent thus, contends that Petitioner must show a sound and reliable medical theory by preponderant evidence, and not merely plausibility. Opp. at 20.

Petitioner’s theory of causation, according to Respondent, is neither sound nor reliable, and the five factors she relies upon do not provide any significant support. *Id.* at 21. Respondent first finds either irrelevant or preempted by the medical literature Petitioner’s assertion that there are “known events” (i.e., exposure to gamma interferon, elevated body temperature, and exposure to APLs) that can significantly aggravate MS. *Id.* With respect to cytokine/gamma interferon response, Dr. Brier observed that the Miller study “implicitly tested” that hypothesis but found that the effects of the flu vaccination are insufficient to cause such relapse. *Id.* (referencing Miller). Dr. Brier also does not deny that some MS patients can experience a recurrence of symptoms when overheated, but that “Uhthoff’s Phenomenon typically occurs in the absence of new demyelination”—whereas the records clearly indicate that Petitioner “experienced an instance of

new demyelination in October 2019, as evidenced by the contrasting lesion on [ ] MRI." *Id.*at 22; Brier Rep. at 12. And Petitioner failed to introduce any cited literature to demonstrate that the flu vaccine can cause or mimic APLs. Opp. at 22.

Respondent next takes issue with Petitioner's contention that components of the flu vaccine can trigger demyelination via molecular mimicry. He notes that "the mere mention of [molecular mimicry] does not constitute satisfaction of the preponderant evidentiary standard" and the homologies discussed in Dr. Tornatore's report, according to Dr. Brier, "can occur by chance, given the "incredible degree of overlap between viral and human genomes." Opp. at 23; Brier Rep. at 12. Moreover, "showings of 'naked' homology do not appreciably advance the contention that mimicry between vaccine antigenic components and a self-tissue establishes a likely mechanism for an autoimmune disease." *Peterson v. Sec'y of Health & Hum. Servs*, No. 22-322V, 2025 WL 3269458, at *12 (Fed. Cl. Spec. Mstr. Oct. 30, 2025). And the significance of the items of literature cited as support for mimicry is either misplaced, unpersuasive, and otherwise not relevant to the case herein. Opp. at 24.

Dr. Tornatore opines that certain case reports involving TM, specifically LETM, offer "mechanistic evidence that a flu vaccine can cause spinal cord inflammation like that seen in Petitioner." *See* Mot. at 22–23; However, Dr. Brier noted that such reference is unhelpful, as "LETM rarely occurs in MS, and is more likely to be seen with other conditions, s[uch] as neuromyelitis optica, MOGAD, or neurosarcoidosis." *Id.* at 25; Brier Rep. at 13.

Similarly, Petitioner's citation to articles such as Beseler (for the proposition that the presence of oligoclonal bands can be evidence that a peripheral inflammatory event has triggered an immune response resulting in a CNS inflammatory event), as well as the Marmoset Paper (for the proposition that a single immunization can lead to the development of a progressive inflammatory disorder) is misplaced. In so arguing, Respondent notes that I have previously found that "[a] careful reading of the Marmoset Paper, [ ] reveals that it stands for far less (and even contradicts the concept of vaccine causation of MS) because "the main thrust of the article was its author's defense of th[e] particular form of animal EAE study as scientifically worthwhile." Opp. at 25–26 (citing *Peterson*, 2025 WL 3269458, at *7). Therefore, Respondent argues that Petitioner has failed to provide a sound and reliable medical theory by a preponderance of evidence. Opp. at 27.

Lastly, Petitioner has failed to provide preponderant evidence demonstrating that her flu vaccine "did cause" a significant aggravation of her MS. None of Petitioner's treating providers attributed her October 2019 symptoms to her receipt of the flu vaccine, and Petitioner concedes that record evidence is lacking to support two of her proposed instances of environmental stimulation leading to MS worsening. Opp. at 27, 28.

Respondent provides no arguments as to the final *Loving* prong, timing, but instead states that "without a reliable medical theory of causation from which this Court can accept a medically acceptable timeframe for the onset of [Petitioner's] condition, [she] has not presented evidence of a medically acceptable temporal relationship between her vaccination and the onset of her significantly aggravated condition." Opp. at 29.

## VI. Applicable Law

### A. *Standards for Vaccine Claims*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[24] There is no Table claim available to Program claimants involving the flu vaccine and either TM or MS.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal

[24] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. Appx. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

Circuit in *Althen,* 418 F.3d at 1278: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury."

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355–56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Knudsen,* 35 F.3d at 549.

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu*, 569 F.3d 1367, 1378–79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325–26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras*, 121 Fed. Cl. at 245.

In discussing the evidentiary standard applicable to the first *Althen* prong, the Federal Circuit has consistently rejected the contention that it can be satisfied merely by establishing the proposed causal theory's scientific or medical *plausibility*. *See Cerrone*, 146 F.4th at 1121 (Fed. Cir. 2025) (arguing for a plausibility standard of proof for prong one "understates the burden [a petitioner] bears under the first factor in the *Althen* formulation"); *Boatmon v. Sec'y of Health & Hum. Servs.*, 941 F.3d 1351, 1359 (Fed. Cir. 2019); *LaLonde*, 746 F.3d at 1339 ("[h]owever, in the past we have made clear that simply identifying a 'plausible' theory of causation is insufficient for a petitioner to meet her burden of proof" (citing *Moberly*, 592 F.3d at 1322)); *see also Howard v. Sec'y of Health & Hum. Servs.*, 2023 WL 4117370, at *4 (Fed. Cl. May 18, 2023) ("[t]he standard has been preponderance for nearly four decades"), *appeal docketed,* No. 23-1816 (Fed. Cir. Apr. 28, 2023). And petitioners always have the ultimate burden of establishing their *overall* Vaccine Act claim with preponderant evidence. *W.C. v. Sec'y of Health & Hum. Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted); *Tarsell v. United States*, 133 Fed. Cl. 782, 793 (2017) (noting that *Moberly* "addresses the petitioner's overall burden of proving causation-in-fact under the Vaccine Act" by a preponderance standard).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*,

569 F.3d at 1375–77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Hum. Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Medical records and statements of a treating physician, however, do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should be weighed against other, contrary evidence also present in the record—including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 742, 749 (2011) (not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Veryzer v. Sec'y of Dept. of Health & Hum. Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review denied,* 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 F. Appx. 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *de Bazan v. Sec'y of Health & Hum. Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must align with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. denied after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 503 F. Appx. 952 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Hum. Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review denied,* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

B. *Legal Standards for Significant Aggravation Claim*

Where a petitioner alleges significant aggravation of a preexisting condition, the *Althen* test is expanded, and the petitioner has additional evidentiary burdens to satisfy. *Loving*, 86 Fed. Cl. at 144. In *Loving*, the Court of Federal Claims combined the *Althen* test with the test from *Whitecotton v. Sec'y of Health & Hum. Servs.*, 81 F.3d 1099, 1107 (Fed. Cir. 1996), which related to on-Table significant aggravation cases. The resultant "significant aggravation" test has six components, which require establishing:

> (1) the person's condition prior to administration of the vaccine, (2) the person's current condition (or the condition following the vaccination if that is also pertinent), (3) whether the person's current condition constitutes a 'significant aggravation' of the person's condition prior to vaccination, (4) a medical theory causally connecting such a significantly worsened condition to the vaccination, (5) a logical sequence of cause and effect showing that the vaccination was the reason for the significant aggravation, and (6) a showing of a proximate temporal relationship between the vaccination and the significant aggravation.

*Loving*, 86 Fed. Cl. at 144; *see also W.C.*, 704 F.3d at 1357 (holding that "the *Loving* case provides the correct framework for evaluating off-table significant aggravation claims"). In effect, the last three prongs of the *Loving* test correspond to the three *Althen* prongs.

In *Sharpe v. Sec'y of Health & Hum. Servs.,* 964 F.3d 1072 (Fed. Cir. 2020), the Federal Circuit further elaborated on the *Loving* framework. Under Prong (3) of the *Loving* test, a Petitioner need not demonstrate an *expected* outcome, but merely that her current-post vaccination condition was worse than pre-vaccination. *Sharpe*, 964 F.3d at 1081. And a claimant may make out a prima facie case of significant aggravation overall without eliminating a preexisting condition as the potential cause of her significantly aggravated injury (although the Circuit's recasting of the significant aggravation standard still permits Respondent to attempt to establish alternative cause, after the burden of proof has shifted to Respondent). *Id.* at 1083.

It remains uncertain as to what *degree* of aggravation of a pre-vaccination condition would be enough to be deemed "significant." The Circuit has made clear that the level of aggravation need not be shown to be catastrophic. *Osenbach v. Sec'y of Health & Hum. Servs.*, No. 2024-1663, 2025 WL 2387944, at *4 (Fed. Cir. Aug. 18, 2025) ("[r]equiring a petitioner to demonstrate that vaccination "wholly altered" their pre-vaccination condition would be at odds with our holding in *Sharpe v. Sec'y of Health & Hum. Servs*. that the *Loving* test does not require petitioners to provide conclusive evidence linking their vaccines to their significant aggravation"). But this aspect of *Osenbach* (which otherwise affirmed dismissal of a significant aggravation claim) seems only to

arise from the well-understood fact that worsening need only be demonstrated *preponderantly* – akin to any other *Loving* or *Althen* prong.

At a minimum, a claimant's injury or disease course must *more likely than not* be shown to exceed what that individual might have experienced but for vaccination. Any transient worsening (say, due to usual vaccine-associated malaise, experienced immediately after vaccination but which subsides thereafter) is insufficient.[25]

C. *Law Governing Analysis of Fact Evidence*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked

[25] This arguably could be understood to reflect a claimant's obligation to satisfy the Act's "severity requirement"—to demonstrate that the injured party experienced at least six months of residual effects, beginning from the date of onset. Section 11(c)(1)(D). In some cases, a claimant might argue that a preexisting condition would have subsided but for vaccination. But in the case of a person with a preexisting illness that is likely to continue *irrespective* of vaccination—like a subclinical disease process that has yet to manifest—severity cannot be established simply by pointing to the illness's persistence. It must instead be preponderantly demonstrated that disease worsening that can be linked to the vaccine results in *more* than six months of worsened sequelae *due to* the vaccine's impact (or perhaps that a pre-existing condition that would not have persisted much past vaccination did so as a result of the vaccine). A passing post-vaccination reaction that does not actually cause sufficient worsening for at least six months, or produce other residual effects that last that long, would not meet this standard. *See Faoro v. Sec'y of Health & Hum. Servs.*, No. 10-704V, 2016 WL 675491, at *27 (Fed. Cl. Spec. Mstr. Jan. 29, 2026), *mot. for review den'd*, 128 Fed. Cl. 61 (Fed. Cl. 2016) (finding that "the vaccinations would not have changed [petitioner's] clinical course and thus, the vaccinations did not significantly aggravate her preexisting condition").

propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs*., No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs*., 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs*., 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs*., No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened

during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs*., 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

D. *Standards for Ruling on the Record*

I am resolving this claim on the filed record. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers where (in the exercise of their discretion) they conclude that doing so will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The decision to rule on the record in lieu of hearing has been affirmed on appeal. *Kreizenbeck v. Sec'y of Health & Hum. Servs*., 945 F.3d 1362, 1366 (Fed. Cir. 2020); *see also Hooker v. Sec'y of Health & Hum. Servs*., No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided case on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Hum. Servs*., 38 Fed. Cl. 397, 402–03 (1997) (determining that special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Fed. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

## I. Overview of Program Treatment of TM and MS as Putative Vaccine Adverse Event

The parties agree that Petitioner was correctly diagnosed with MS, even if her initial presentation appeared to establish TM, and that the pathogenic process that would later result in clinical manifestations of MS was already underway as of the time of vaccination. Mot. at 12, 13. The medical record overwhelmingly supports this conclusion. Ex. 8 at 39–40 (official diagnosis of MS and beginning of MS-specific treatment plan). As of mid-October 2019, imaging revealed the presence of existing, non-enhancing lesions (which likely existed pre-vaccination) plus some newer, enhancing lesions. Ex. 5 at 108, 217. In addition, no treaters proposed that TM characterizes Petitioner's overall course, even if they reasonably believed at the *outset* of her October 2019 presentation that Petitioner may only have been experiencing a particular form of TM. Rather, and after time progressed, Petitioner's course lengthened, and additional clinical and testing evidence was adduced that, when viewed in its totality, better supported the conclusion that MS was the overall proper diagnosis. *Id.*

Nevertheless, some discussion of the differences between TM and MS is warranted (in no small part because Petitioner still relies on Program treatment of TM to bootstrap into contention her views about the flu vaccine's putative association with her subsequent condition).

*Diagnostic Definitions of TM and MS*

TM usually presents as a one-time, monophasic (hence non-recurring) CNS injury—although it can leave lasting deficiencies in a patient who experiences it.[26] It can be the result of a neuroinflammatory attack on the spiral cord, with resulting symptoms depending on the cord level of lesions. *Henningsen v. Sec'y of Health & Hum. Servs*., No. 21-1101V, 2026 WL 1649737, at *32 (Fed. Cl. Spec. Mstr. May 8, 2026), *mot. for review filed,* June 8, 2026. TM has been associated with infectious or systemic autoimmune diseases, but can be idiopathic in origin as well. *Henningsen,* 2026 WL 1649737, at *32. And as Dr. Tornatore admitted in this matter, TM is increasingly understood to be overinclusive as a diagnosis; not only can some spinal cord myelopathies *not* be attributable to inflammation or an autoimmune process, but TM can be attributable to other, larger CNS-impacting disease processes, like MS. *Id.;* Blackburn & Greenburg at 2. There is thus a difference between an acute, immune-mediated instance of myelitis (perhaps due to an infection)—as alleged occurred in this case—and TM-like presentations that cannot subsequently be understood to be "only" TM.

MS is distinguishable in significant ways. As I previously noted in *P.M. v. Sec'y of Health & Hum. Servs*., No. 16-949V, 2019 WL 5608859, at *21 (Fed. Cl. Spec. Mstr. Oct. 31, 2019):

> MS is a demyelinating CNS disease. *See Taylor v. Sec'y of Health & Human Servs*., No. 13-700V, 2018 WL 2050857, at *21 (Fed. Cl. Spec. Mstr. Mar. 9, 2018). It likely has an autoimmune pathogenesis. *W.C. v. Sec'y of Health & Human Servs*., No. 07-456V, 2011 WL 4537877, at *3 (Fed. Cl. Spec. Mstr. Feb. 22, 2011), *mot. for review den'd*, 100 Fed. Cl. 440 (2011), aff'd, 704 F.3d 1352 (Fed. Cir. 2013). Patients diagnosed with MS typically experience multiple episodes of CNS demyelination separated in time and space (meaning throughout the CNS), concurrent with a progressive, if remitting and relapsing, decline in their overall health course. *Taylor*, 2018 WL 2050857, at *21. An MRI can be used to corroborate the dissemination in space and time requirement, and often reveals old lesions as well as enhancing/new lesions. *Id*. Symptoms can include numbness or weakness in the body, loss of vision, tremors, unsteady gait, slurred speech, and dizziness. *Id.*

---

[26] *Ses* S. Plotkin et al., Plotkin's Vaccines t874 (7th ed. 2018) (listing flaccid diplegia and atrophy as sequalae between three months and one year after occurrence).

A number of infections have been associated with TM (opening the door to a theory that an analogue vaccine could also cause it). *Henningsen,* 2026 WL 1649737, at *32. But MS has no known autoantibodies that are believed to drive or trigger its pathogenic process,[27] differentiating it from certain peripheral neuropathies like GBS. *Bielak v. Sec'y of health & Hum. Servs.*, No. 18-761V, 2023 WL 35509, at *33, 34 (Fed. Cl. Spec. Mstr. Jan. 2, 2023). And while in the past MS has been speculated to possibly have an infectious etiology, its *most likely* triggering causes remain unknown. *Samuels v. Sec'y of Health & Hum. Servs.*, No. 17-071V, 2020 WL 2954953, at *21 (Fed. Cl. Spec. Mstr. May 1, 2020); *see also* First Tornatore Rep. at 12 (admitting that "the initial trigger for MS is unknown").[28]

*Program Treatment of TM vs. MS*

TM has often been deemed a compensable vaccine injury, as evidenced by numerous prior Program decisions. *See, e.g.*, *Raymo v. Sec'y of Health & Human Servs.*, No. 11-654V, 2014 WL 1092274, at *23 (Fed. Cl. Spec. Mstr. Feb. 24, 2014) (finding causal relationship between flu vaccine and TM). While I would not deem the issue settled as a matter of Program law, the argument that the flu vaccine can cause TM is wholly cognizable, and often successful.

But the Program recognizes differences between MS and TM. MS is accepted to be *chronic*, featuring relapses or even worsening progression over a considerable amount of time. *Porch v. Sec'y of Health & Hum. Servs.*, No. 17-802V, 2023 WL 21875, at *21 (Fed. Cl. Spec. Mstr. Jan. 3, 2023); *Samuels*, 2020 WL 2954953, at *18–19. MS can also be subclinical for long periods of time, with its characteristic lesions discovered only *after* clinical manifestations appear (or existing prior to onset of outward symptoms). *Samuels,* 2020 WL 2954953, at *18. Thus, even if both *involve* nerve demyelination, MS and TM are not congruent. Indeed, MS is a far more ominous diagnosis, since its course can prove significantly debilitating over time, whereas TM often resolves faster.

In prior decisions, I have observed a general distinction between *acute*/monophasic demyelinating processes that result in sudden and abrupt injury to the central nervous system but later subside, whether TM or ADEM, and those that are chronic/relapsing/remitting like MS. *See*

[27] Oligoclonal bands are a biomarker of MS because they reveal CNS inflammation—but nothing in this case has been filed to suggest that oligoclonal bands are produced as a result of vaccination, or drive MS pathogenically.

[28] At best, *one* wild infection—Epstein-Barr virus ("EBV")—has been demonstrated in a recent study to have a likely MS association. *See, e.g.*, *Nieves v. Sec'y of Health & Hum. Servs.*, No. 18-1602V, 2023 WL 3580148, at *20 (Fed. Cl. Spec. Mstr. May 22, 2023) (discussing recent EBV study), *mot. for review den'd*, 167 Fed. Cl. 422 (2023). But EBV is not congruent with influenza—EBV is a common form of herpes virus, and has a capacity to remain dormant within the human body (subject to reactivation), unlike the flu virus. *See Peterson v. Sec'y of Health & Hum. Servs.*, No. 22-322V, 2025 WL 3269458, at *23n.20 (Fed. Cl. Spec. Mstr. Oct. 30, 2025). And there is no vaccine for EBV—meaning claimants cannot make the argument that if the wild analog virus/bacteria "can cause" MS, then the vaccine can as well.

*e.g., Morgan v. Sec'y of Health & Hum. Servs.*, No. 15-1137V, 2019 WL 7498665, at *16 (Fed. Cl. Spec. Mstr. Dec. 4, 2019), *mot. for review den'd,* 148 Fed. Cl. 454 (2020), *aff'd,* 850 F. App'x 775 (Fed. Cir. 2021); *Samuels v. Sec'y of Health & Hum. Servs.,* No. 17-071V, 2020 WL 2954953, at *18 (Fed. Cl. Spec. Mstr. May 1, 2020) (MS with first presenting symptom ADEM). While the former may more reasonably be thought in some cases to be associated with some vaccines, it is harder to substantiate such a relationship with disease processes that do not begin and end in a defined period of time (and are less likely to be the result of the one time "hit" of a vaccination—an immediate immune stimulus that is not long-lived, even if it is intended to "train" a future immune response).

This chronic versus acute distinction is recognized in Vaccine Program outcomes, across a wide variety of claims.[29] And in the case of MS specifically, far fewer environmental factors, if any (including the flu vaccine), have been associated with chronic and relapsing-remitting CNS illnesses like MS. *Wei-Ti Chen v. Sec'y of Health & Human Servs.*, No. 16-634V, 2019 WL 2121208, at *22 (Fed. Cl. Spec. Mstr. Apr. 19, 2019) (insufficient evidence was provided to support a causal connection between the flu vaccine and petitioner's subsequent development of neuromyelitis optica spectrum disorder, which is chronic and relapsing/remitting like MS); *Hunt v. Sec'y of Health & Human Servs*., No. 12-232V, 2015 WL 1263356, at *15 (Fed. Cl. Spec. Mstr. Feb. 23, 2015) (denying entitlement where MS was the alleged injury, but the causation evidence related to ADEM) *mot. for review den'd*, 123 Fed. Cl. 509 (2015).

Another factor that has been observed in many prior Program decisions (as noted above) is the fact that TM can often constitute the *initial presenting symptom* of MS, with subsequent flares/relapses occurring later on. This is consistent with one commonly-accepted diagnostic criteria for MS—that it requires proof of *two* manifestations (e.g., lesions or symptoms) separated by time and "space" (meaning a second manifestation/flare impacting the body elsewhere). *Hunt*, 2015 WL 1263356, at *11 (noting that an MS diagnosis traditionally requires "at least two events disseminated in time and space" (internal quotation marks omitted)). Thus, when what initially appears to be TM is followed by subsequent neurologic symptoms or other corroborating proof of a more chronic condition, the claimant's actual injury is *not limited to* the initially-diagnosed TM—and TM is no longer a diagnostically-correct classification for the injured party's presentation. *Pek v. Sec'y of Health & Hum. Servs.*, No. 16-0736V, 2020 WL 1062959, at *16

[29] For example, while GBS (an acute peripheral nervous system demyelinating disease) after receipt of the flu vaccine is a Table claim, chronic inflammatory demyelinating polyneuropathy, or "CIDP," (what is often mischaracterized as "chronic GBS") is not. *Nieves*, 2023 WL 3580148, at *39 n.43. In fact, I have noted in prior cases that the evidence associating CIDP with the flu vaccine is significantly less robust than what links the same vaccine to GBS. *Mason v. Sec'y of Health & Hum. Servs.*, No. 17-1383V, 2022 WL 600415, at *22 (Fed. Cl. Spec. Mstr. Feb. 4, 2022) (contrasting the strength of evidence supporting a link between the flu vaccine and CIDP versus that supporting a link to GBS). At bottom, chronic versions of a disease involve different biological inputs and immunologic "errors" that impact physiologic processes differently from a one-time, transient, acute "hit" to the immune system of the sort that a vaccine might trigger. *Houston v. Sec'y of Health & Hum. Servs.*, No. 18-420V, 2021 WL 4259012, at *16 (Fed. Cl. Spec. Mstr. Aug. 19, 2021) (discussion of the differences in pathogenesis between GBS and CIDP).

(Fed. Cl. Spec. Mstr. Jan. 31, 2020). A petitioner's *later* health history may provide medical details missing at the start, subsequently illuminating the true, chronic nature of the injury. This makes it erroneous to carve out the presenting symptom as a separate injury, with MS constituting almost a downstream evolution of the TM.

Relying upon the above, *I have never found entitlement in a case where a Petitioner's initial presenting illness may have appeared to be an acute event (like TM or ADEM), but later turned out to be the first manifestation of MS*. In such matters, the TM did not "cause" the MS. And I have not considered the law and evidence supporting TM's association with vaccination to be blankly applicable to MS, even if vaccines are credibly associated with one kind of monophasic TM. *See generally Peterson*, 2025 WL 3269458 (flu vaccine not preponderantly shown to cause MS); *Garris v. Sec'y of Health & Hum. Servs.,* No. 22-1354V, 2025 WL 2401999 (Fed. Cl. Spec. Mstr. June 20, 2025) (hepatitis B vaccine not demonstrated to be capable of causing MS); *Pek*, 2020 WL 1062959, at *16; *Maciel v. Sec'y of Health & Hum. Servs.*, No. 15-362V, 2018 WL 6259230, at *23 (Fed. Cl. Spec. Mstr. Oct. 12, 2018), *mot. for review denied* (Fed. Cl. Apr. 1, 2019); *L.Z. v. Sec'y of Health & Hum. Servs.*, No. 14-920V, 2018 WL 5784525, at *18 (Fed. Cl. Spec. Mstr. Aug. 24, 2018).

I decided *Peterson* less than a year ago, and it is particularly on point, even though it did not involve a claim of significant aggravation. The *Peterson* petitioner alleged his MS was caused by the flu vaccine, relying on an opinion constructed by Dr. Tornatore that was unspooled over several lengthy written reports. *Peterson,* 2025 WL 3269458, at *4–12. Dr. Tornatore therein cited numerous items of literature also referenced in this case, making many arguments almost identical to those now advanced, and obligating me to engage in a careful review of those articles. *Id.* at *4-12 (discussing Markovic-Plese, the Marmoset Paper, Beseler, the 2012 IOM Report, Rowhani-Rahbar, Schonberger, Bielekova, Nachamkin, etc.). While the opinions set forth in the two reports at issue in this case are not word-for-word identical to what I reviewed in *Peterson* (and I have consequently reviewed the opinion herein in detail), the similarities crowd out the differences.

In addition, there are several sound, well-reasoned decisions rejecting the conclusion that the flu vaccine can likely *aggravate* existing MS. *See, e.g.*, *W.C. v. Sec'y of Health & Hum. Servs*., 704 F.3d 1352, 1360 (Fed. Cir. 2013) (upholding a special master's decision finding that the flu vaccine was not shown to be capable of significantly aggravating MS via the mechanism of molecular mimicry); *See also Townsend v. Sec'y of Health & Hum. Servs.*, No. 14-266V, 2023 WL 6212496 (Fed. Cl. Spec. Mstr. Aug. 29, 2023), at *26 (evidence did not support conclusion that the flu vaccine can exacerbate MS), *mot. for review den'd*, 170 Fed. Cl. 130 (2024); *Mathis v. Sec'y of Health & Hum. Servs.,* No. 20-431V, 2023 WL 5436135, at *5-11 (Fed. Cl. Spec. Mstr. Aug. 1, 2023 ) (flu vaccine and aggravation of MS not preponderantly established).

In none of those comparable matters was the special master's reasoning called into question or successfully appealed. In fact, the reviewing courts or deciding special masters observed the

same kind of problems with the causation theory that impelled me originally to deny compensation in this case. Thus, as noted by the Federal Circuit in *W.C.,* even if the oft-invoked mechanism of molecular mimicry has baseline reliability as a *general* theory for certain autoimmune diseases, this does not also mean that it can be slotted into every case—and there, the claimant needed to show something more specific to the case circumstances in order to establish that molecular mimicry was a likely mechanism for MS worsening. *W.C.,* 704 F.3d at 1360. But the *W.C.* petitioner's expert[30] did not successfully establish a likely cross-reactive response to the flu vaccine, and the special master had reasonably relied on evidence suggesting vaccines did not aggravate MS. *Id.* at 1360–61. A special master reached a comparable conclusion in *Mathis,* where it was observed that (i) a number of reliable epidemiologic studies did not stand for the conclusion that vaccines were a risk factor for MS patients (*Mathis,* 2023 WL 5436135, at *6-9), and (ii) molecular mimicry was not preponderantly demonstrated to likely drive the pathogenic process leading to worsening (*Id.* at *9–10).

I have reached the same conclusion in cases I have decided involving a number of different covered vaccines. *See, e.g.*, *Juranek v. Sec'y of Health & Hum. Servs.*, No. 19 226V, 2025 WL 399501 (Fed. Cl. Spec. Mstr. Jan. 8, 2025) (denying compensation in a case where petitioner claimed that the flu vaccine significantly aggravated MS); *Garris*, 2025 WL 2401999, at *29–30 (hepatitis B vaccine not shown to have aggravated MS); *P.M.*, 2019 WL 5608859, at *22–25 (flu vaccine and aggravation of MS); *L.Z.*, 2018 WL 5784525, at *17–19 (same).

In resolving such significant aggravation claims, I have noted that prevailing medical science views MS symptoms flares or relapses to be *intrinsic* to MS's natural, relapsing-remitting course. *See, e.g.*, *P.M.,* 2019 WL 5608859, at *22–24. There is also an important distinction between a flare's proximate trigger (and a *wide variety* of external factors can cause one—as Dr. Tornatore's discussion of Uhthoff's phenomena underscores) and what initiates MS in the first place. And because MS is a not-uncommon autoimmune condition,[31] there is no reason there would be a paucity of research on the subject *if* the question of the danger of vaccine-instigated MS worsening had academic or clinical value. Indeed, the risks of a wild infection are high for MS patients, furthering the importance of research considering whether environmental stimuli like vaccines (which would prevent such opportunistic infections) are potentially dangerous. *Garris,* 2025 WL 2401999, at *30. And yet such evidence is lacking.

There are admittedly some decisions embracing the contention that vaccines could aggravate existing, subclinical MS. *See, e.g., Doles v. Sec'y of Health & Hum. Servs.,* 2025 WL 1177875, at *8 (Fed. Cir. Apr. 23, 2025); *Gardner v. Sec'y of Health & Hum. Servs.*, No. 17-1851V, 2023 WL 9288070 (Fed. Cl. Spec. Mstr. Dec. 21, 2023). Of course, special masters are

[30] In *W.C.,* Dr. Tornatore also served as the claimant's expert. *W.C.,* 704 F.3d at 1360.

[31] R. Fox & J. Cohen, *Multiple Sclerosis: The Importance of Early Recognition and Treatment*, 68 Cleveland Clinic J. Med. 157 (2001), filed as Ex. A-5 (ECF No. 62-6) ("[i]n the United States, an estimated 250,000 to 350,000 people have MS.").

not bound by each other's opinions—and thus I am as free to reach my own reasoned conclusions, based on the record before me and in light of my experience resolving comparable claims, as my colleagues (who have often reached contrary conclusions without endeavoring at all to distinguish the many decisions going the other way). But I do not deem the reasoning of these contrary determinations to be particularly persuasive in guiding me herein.

The most recent such decision is *Doles*, and it illustrates what I would posit are significant limitations to theories embracing the possibility of vaccine worsening of MS. There, a special master found that the polio and Tdap vaccines significantly aggravated a claimant's pre-existing, clinically silent MS. *Doles,* 2022 WL 3229286, at *18. In determining that vaccination could worsen subclinical MS (meaning MS that had yet to manifest observable, detrimental symptoms), the special master relied in part on a particular item of literature[32] (not filed in this case) which facially seemed to undermine a flu vaccine-MS association, but which also included some secondary findings suggesting the capacity of the vaccine to more rapidly "unmask" preclinical MS and change its trajectory in a negative manner.

---

[32] *See* A. Langer-Gould et al., *Vaccines and the Risk of Multiple Sclerosis and Other Central Nervous System Demyelinating Diseases,* 71 JAMA Neurol. 12:1506-13 (Oct. 2014) ("Langer-Gould") (referenced in *Doles*, 2025 WL 1177875, at*4; *see also Peterson,* 2025 WL 3269458, at *6 (discussing Langer-Gould). I am very familiar with this article. Langer-Gould was an epidemiologic, case-controlled study of 780 vaccinated individuals diagnosed with MS or a different CNS-oriented demyelinating disease, comparing them to 3,885 control subjects, with a primary focus on the risk from the Hepatitis B or HPV vaccines (although its subjects had also received the flu vaccine). Langer-Gould at 1508, 1509.

Langer-Gould's "marquee" conclusion was that *there was "no long-term association of vaccines with an increased risk of MS.*" Langer-Gould at 1512 (emphasis added). But it also observed a statistically-significant increased risk of CNS symptoms onset within 30 days of receipt of any vaccine for the studied group—consistent with the idea that in individuals with "subclinical autoimmunity," a vaccine might act as a "pro-inflammatory cofactor," in much the same way an intercurrent infection might prompt an MS relapse/flare. Langer-Gould at 1512.

This secondary finding would seem to support the argument that vaccines can aggravate MS—but Langer-Gould's authors actually qualified its importance. They noted that because *overall* there was no greater exposure risk to MS from vaccination over time, "[t]his argues against causality because the risk in the vaccinated group should remain elevated *regardless of whether the time window between exposure and clinical disease expression is defined as 15 days or 3 years*." Langer-Gould at 1512 (emphasis added). In effect, Langer-Gould deemed the secondary results to be consistent with the fact that *any* proinflammatory immune stimulation was as much of a risk to *existing* MS patients (who often experience flares due to a variety of environmental factors—as reflected by Uhthoff's phenomena) as those who may be experiencing "subclinical autoimmunity," causing a hastening of "symptom onset." *Id.* In other words, its findings established that individuals who were *already experiencing MS* (whether subclinically or not) might experience a "relapse" (whether first clinical manifestation or a second), but the vaccine was not otherwise responsible for their MS writ large, let alone its course. *Id.* ("vaccines (like infections) may accelerate the transition from subclinical to overt autoimmunity *in patients with existing disease*") (emphasis added)).

Thus, as I observed in *Peterson,* Langer-Gould's sub-finding about a heightened "risk" of MS clinical onset close-in-time to vaccination only established that the vaccine could *temporarily* spark an MS clinical flare. *Peterson,* 2025 WL 3269458, at *26. It did not also mean that the vaccine would *worsen* the course of the preexisting disease process, or that the process would have been expected to *remain* subclinical but for vaccination.

On review, the Court of Federal Claims deemed the article in question to have been inappropriately considered in its entirety, because the sub-finding it contained that was relied upon by the special master lacked statistical reliability. *Doles v. Sec'y of Health & Hum. Servs.*, 159 Cl. 241, 247–48 (2022). But the Federal Circuit found that the special master's weighing of that item was reasonable, emphasizing the deference that should be paid to special masters in resolving cases and their attendant assessment of what weight to give medical literature. *Doles v. Sec'y of Health & Hum. Servs.*, No. 2023-2404, 2025 WL 1177875, at *2 (citing *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 871 (Fed. Cir. 1992)).

*Doles* thus stands *only* for the proposition that a special master's weighing of this kind of medical/scientific causation evidence should be given deference if it otherwise is reasonable. *Eberline v. Sec'y of Health & Hum. Servs.*, No. 23-655V, 2025 WL 3852456 (Fed. Cl. Spec. Mstr. Dec. 1, 2025), *mot. for review den'd*, No. 23-655, 2026 WL 1746434, at *19 (Fed. Cl. May 29, 2026) ("*Doles* held that a special master need not automatically ignore medical literature merely due to a lack of statistical significance"). This is not equivalent to an endorsement of the entitlement determination in *Doles,* or to the persuasiveness of its reasoning.[33] Certainly the Circuit said nothing about whether cases finding *against* petitioners in this context are well-founded generally (and relying on the deferential standard applied in *Doles,* there is no reason to reject that group of decisions—since they too involve special master analysis of items of literature). Indeed—by the Circuit's reasoning, the many counter-determinations by special masters past and present (including me) that the evidence they have seen in cases does *not* preponderantly support the causal likelihood of vaccine-induced MS worsening deserves the same deference that prompted the Circuit to affirm the special master's underlying *Doles* determination.

## II. Petitioner Has Not Carried Her *Loving* Burden

Petitioner's claim now centers on the contention that the flu vaccine worsened a preexisting injury/condition - and although she strives to refer to it ambiguously as an "underlying asymptomatic demyelinating condition" (Mot. at 16), it is more precisely characterized as RIS or "subclinical" MS. Thus, she must preponderantly satisfy each of the *Loving* prongs (some of which correspond to the three *Althen* prongs). She has failed to do so—and below, I discuss those issues most critical to my determination, along with some of the relevant prongs (since Program claimants must meet *all* relevant causation prongs to prevail). *Dobrydnev v. Sec'y of Health & Hum. Servs.*, 566 Fed. Appx. 976, 980 (Fed. Cir. 2014).

---

[33] In fact, as controlling Circuit caselaw provides, review of a special master's weighing is not an exercise in substituting the reviewing panel or court's determination for the special master's reasoning, if it has a demonstrated reasonable grounds. *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1360 (Fed. Cir. 2000). The special master's relative weighing is not to be second-guessed, no matter how much the reviewing body believes a different outcome is envisionable if it had been performed by another neutral.

A. TM Cannot Likely "Evolve" into MS

Petitioner has mostly accepted MS as the correct diagnosis, despite her initial presentation (which led treaters reasonably, albeit on an incomplete medical record, to suspect TM). Mot. at 10. This is wholly consistent with my initial review of the claim as well (and one of the reasons I resisted expert discovery in this case). The "real" post-vaccination injury Petitioner experienced was MS, not TM, and the record establishes that Petitioner's MS was already underway pre-vaccination, even if she had yet to manifest outward, clinical symptoms of it. Petitioner's myelitis constituted her first MS flare.

Petitioner nevertheless seems determined to leverage evidence for a flu vaccine-TM association into this case. Thus, Dr. Tornatore's reports discuss at length TM's purported vaccine association, as well as the autoimmune mechanisms proposed to mediate it and their possible mimicry connections with homologic components of the flu vaccine. *See, e.g.*, First Tornatore Rep. at 28–34. Petitioner also studiously avoids framing her claim as one attempting to prove aggravation of MS. *See, e.g.*, Mot. at 16 ("[h]ere, Dr. Tornatore's theory of causation is that the flu vaccination Petitioner received on September 25, 2019, *significantly aggravated her underlying asymptomatic demyelinating condition* in a manner that was clinically consistent with TM, which eventually evolved into MS") (emphasis added). In effect, Petitioner implicitly clings to the view that her TM-like presentation *mattered*, for purposes of causation—and that any demonstrated flu vaccine-TM association has carryover benefits in proving MS aggravation.

Evidence offered in this case relating to TM's pathogenesis, and its possible association with vaccination, may have some probative value, even though TM is not the proper diagnosis. It is reasonable for Petitioner to contend, for example, that the autoimmune cross-reactive processes that can cause direct spinal cord myelitis are not only implicated in MS, but could in theory worsen it. I thus do not disregard that evidence out of hand below (although the arguments that relate to it have been repeatedly addressed, and rejected, in prior cases, going as far back as *W.C.* over ten years ago).

But I am compelled to emphasize (as I attempted to do in the first iteration of this Decision in 2024): *no medical and scientific support has been offered in this case for the concept that TM attributable to some environmental factor (vaccination or infection) can secondarily evolve into MS*. Indeed—this is an assertion lacking *any* corroborative support of which I am aware. TM is simply not caused by environmental factor X, and then *becomes* MS; rather, *the MS explains the TM*.

As noted above, TM is somewhat overinclusive as a diagnostic classification, potentially misapplied to a large number of diseases or injuries that impact the spinal cord and produce neurologic-like symptoms—but which are not themselves one-time instances of an immune-

mediated myelitis. *Henningsen,* 2026 WL 1649737, at *32. Dr. Tornatore acknowledged as much in his expert report. First Tornatore Rep. at 28. TM can also constitute the presenting symptom of a number of CNS-oriented disease processes—including MS. When an individual meets the diagnostic criteria for MS—as is agreed to have been the case here—what might have earlier been understood by contemporaneous treaters to be a single instance of TM is no longer tenable in light of the accumulation of clinical and lab evidence. It has not been shown that medical science believes an independent instance of TM can "change" into MS under the right conditions.

Thus, Petitioner's claim must be understood to involve aggravation *not* of TM but of preexisting, subclinical MS (albeit with the first presenting relapse/flare being TM-like)—not worsening of some mysterious underlying asymptomatic demyelinating condition.

B. Petitioner Has Not Preponderantly Demonstrated the Flu Vaccine "Can Worsen" MS (*Loving* Prong Four)

The medical record establishes that the pathogenic process leading to Petitioner's MS was likely underway before her September 2019 vaccination, but she had yet to experience outward symptoms until after. The fact that Petitioner's MS could only have been diagnosed once it actually manifested does not self-evidently provide evidence of "aggravation" when compared to her pre-vaccination health (thus failing *Loving* prong three).[34] But even if it is assumed this prong is met (Petitioner was literally in *worse* health post-vaccination), it still has not been preponderantly established that the flu vaccine likely *could* be responsible for such aggravation.

At the outset, it should be emphasized (as argued by Respondent) that Petitioner mischaracterizes her burden of proof in establishing the first *Althen* prong/Fourth *Loving* prong. Throughout her brief (which I note was filed in October 2025, and hence after the Federal Circuit

[34] Program claimants often *assume* that a disease that has not yet clinically manifested can be shown to have been "unmasked" by a vaccine's immune stimulation, and that this amounts to aggravation. This may not be all that well-founded an assumption, however. It is one thing for a claimant to point to a diagnosed, preexisting disease of which they were aware, and that they maintain was made worse due to receipt of a vaccine. But is the same true for an unknown, subclinical disease process? Only hindsight establishes its existence—and it is speculative to propose that any such condition would *never* have clinically surfaced but for receipt of a vaccine. Moreover, this reframing of subclinical injuries that manifest temporally after vaccination as *vaccine-worsened* conditions can capture virtually any autoimmune condition that has an insidious or long pathogenic course—stretching the significant aggravation claim to its breaking point.

Although my analysis takes Petitioner's construction of her claim at face value, this way of presenting claims that otherwise cannot meet the standard *Althen* prongs should be scrutinized more carefully. When claimants cannot show a vaccine caused their illness (since it predated vaccination), they should not be permitted to "save" their claim by squeezing it into the significant aggravation framework; rather, such claims should arguably be reserved for circumstances in which the preexisting condition and its debilitating qualities are already known (for only then can aggravation actually be evaluated).

had addressed—hopefully for the last time—this very issue in *Cerrone*),[35] Petitioner frames the evidentiary standard as if she need only demonstrate a "plausible" theory. *See, e.g.*, Mot. at 10–11; Reply at 3, 5. She also suggests that treating the standard as preponderant amounts to unreasonably elevating her burden (based on an upside-down construction of several Circuit cases squarely addressing the issue). Mot. at 10 (proposing it an error to deem decisions like *Boatmon* to "enhance[] the petitioner's burden in any way").

This argument is incorrect as a matter of law, as the Circuit has now explained several times (and as the Court itself has attempted to clarify). *Demore v. Sec'y of Health & Hum. Servs.*, 175 Fed. Cl. 756, 763 (2025) (Solomson, C.J.) ("the Federal Circuit has long held that the burden of proof for a petitioner to demonstrate that an injury was caused by a vaccine in an off-table case is preponderance of the evidence, and that evidence of mere 'plausibility' does not meet the preponderance burden"). Evidence supporting the view that a vaccine *plausibly* could cause an injury is not equivalent to a showing that it *more likely than not* could do so—and the fact that it is difficult to prove causation generally (due in part to the many remaining mysteries surrounding the workings of the human immune system) does not excuse claimants from meeting their evidentiary obligation. *Caves v. Sec'y of Health & Human Servs*., 100 Fed. Cl. 119, 143 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012) ("[t]he standard of proof does not operate as a sliding scale that varies depending upon the quantity and quality of the scientific evidence that is available"). Claimants might understandably *prefer* the easier-to-meet standard of plausibility. *Sheller v. Sec'y of Health & Hum. Servs.,* 121 F.4th 1301, 1308 (Fed. Cir. 2024) ("[a] plausible theory ... resides somewhat 'lower than the preponderant evidence standard required to prove entitlement to compensation' ") (*citation omitted*). But that is not the *correct* evidentiary standard.

Petitioner's showing in this case was clearly not preponderantly established, and no more convincing than (or even distinguishable from) what Dr. Tornatore proposed in *Peterson* (or *W.C.* for that matter—where he also served as expert). I note the following deficiencies in the theory as presented:

*Little Reliable Evidence Supports a Flu Vaccine-MS Association Generally*

Dr. Tornatore references some "known events" that he maintains have been demonstrated to significantly aggravate MS, thus permitting the conclusion that a vaccine could do the same. Mot. at 17–19 (citing First Tornatore Rep. at 12–16, Ex. 30 at 1, 7). For example, he contends a particular cytokine (gamma interferon) stimulated by vaccination could arguably worsen MS and/or trigger a relapse. And yet as Dr. Brier established, that potentiality was indirectly evaluated in Miller (since the broader effects of vaccination on MS patients was at issue—and those

[35] *Cerrone* was issued at the end of July 2025, yet Petitioner's Ruling on the Record Motion (filed three months later) makes no mention of it at all.

individuals would experience vaccine-related cytokine upregulation), but the data generated by that study does not support Dr. Tornatore's hypothesis. Miller at 313. Thus, this mechanistic contention does not rise above the level of plausibility, if it has not been wholly rebutted. Vaccines may stimulate production of cytokines, and cytokines are involved in some autoimmune processes, but this does not lead to the conclusion that vaccines likely cause certain cytokine-associated disease processes absent "connective tissue" evidence missing from Dr. Tornatore's reports. It is this kind of invalid syllogistic reasoning that characterizes much of Dr. Tornatore's theory.

Similarly, Dr. Tornatore notes studies where MS progression was shown experimentally to be worsened by an "environmental" stimulus. Bielekova is a reliable study in which direct transmission of APLs engineered to spark a cross-reaction with MBP (although based on the hypothesis that *amelioration* of an experimental version of MS was likely) had a negative impact on disease progression. Bielekova at 1173. But it was not shown by the study that the experimental use of APLs designed for a particular purpose is comparable to receiving a flu vaccine—and as noted above, Bielekova is too *sui generis* to give it significant weight in this context. I also do not give probative weight to evidence relating to purported mimicry as a mechanism in the context of distinguishable CNS conditions like MOGAD, which are associated with specific autoantibodies undiscovered for MS, and not otherwise relevant to it.

In addition, epidemiologic evidence offered by Respondent supports the conclusion that vaccination is more likely *protective* of MS patients than a risk factor. *Townsend*, 2023 WL 6212496, at *26 (noting in that case the existence of "numerous and more recent studies that examined whether the flu vaccine increases the risk of MS or the risk of MS relapse, and these studies also do not show a causal association"). These studies are more direct evidence than what Petitioner offers, yet they undermine a causal relationship. And as noted in my discussion of the Marmoset Paper, it cannot even be assumed that the disease processes at issue in MS are driven by external, environmental factors, as opposed to dysfunction that begins *within* the CNS. *Peterson,* 2025 WL 3269458, at *9, 28.

Finally, I reiterate that (a) wild influenza infections are not known to *cause* MS,[36] (b) no other wild infection (except for possibly the EBV infection, which is distinguishable from the wild flu virus) is MS-associated, (c) MS has no known external trigger, and (d) there is a known MS biomarker, oligoclonal bands—but their pathogenic role in MS is unknown, they originate in the CNS rather than the periphery, and no evidence suggests wild infections, or analogous vaccines for that matter, cause their production. There is simply overall insufficient evidence that the flu vaccine is a likely risk factor for MS relapse or worsening.

[36] Infections may be *dangerous* to existing MS patients, but as established by articles and studies referenced by Dr. Brier, vaccination likely protects against that risk (and thus does not recapitulate the effect of a wild infection). And in any event, this case involves not a preexisting MS diagnosis, but an individual with subclinical MS that had not yet manifested—a distinguishable condition.

*Theoretical Components Required to Deem Molecular Mimicry a Likely Mechanism for Vaccine-Induced MS Aggravation Are Missing or Inadequately Established*

The causation theory in this case disinters oft-argued points about the capacity of vaccine protein components (via mimicry between their peptide sequences and those found in relevant self-structures—here, nerve MBP) to cross-react, causing antibodies purportedly generated by the immune response to the vaccine to engage in an autoimmune attack on self. It cannot be denied that as a general matter, molecular mimicry is a reliable scientific theory for how *some* autoimmune disease processes occur and/or are instigated. GBS stands as a particularly good example.

But general reliability in the context of analogous neuropathic conditions is not enough—evidence must connect the mechanism to *the context at hand*, and thus the disease in question. "[T]he mere mention" of molecular mimicry is not enough to satisfy the first *Althen* prong (or fourth *Loving* prong). *Loyd v. Sec'y of Health & Hum. Servs.*, No. 16-811V, 2021 WL 2708941, at *31 (Fed. Cl. Spec. Mstr. May 20, 2021), *mot, for review den'd,* (Fed. Cl. Nov. 12, 2021) , *aff'd*, 2023 WL 1878572 (Fed. Cir. Feb. 10, 2023); *see also McKown v. Sec'y of Health & Hum. Servs.*, No. 15-1451V, 2019 WL 4072113, at *50 (Fed. Cl. Spec. Mstr. July 15, 2019) ("merely chanting the magic words 'molecular mimicry' in a Vaccine Act case does not render a causation theory scientifically reliable, absent additional evidence specifically tying the mechanism to the injury and/or vaccine in question.").

Rather, claimants relying on molecular mimicry as a mechanism[37] to explain how a vaccine might worsen a disease process are reasonably tasked with offering some "additional evidence" specific to the context of their claim. *W.C.*, 704 F.3d at 1352. Here, that has not occurred – and Dr. Tornatore makes many of the same arguments (approaching being identical) about potential mimicry with the flu vaccine's antigens that he made in *Peterson*—but which were not deemed persuasive or reliable in the context of MS. *Peterson,* 2025 WL 3269458, at *12, 27–28. He relies on narrowly-demonstrated homologies, despite the fact that (as Dr. Brier noted) such sequential mimicry occurs often in nature with no disease-causing effects. Brier Rep. at 12. He invokes literature to support molecular mimicry as a likely mechanism that I have routinely encountered but rejected in prior matters (like Ziegler, Markovic-Plese, the 2012 IOM Report, Bielekova, Nachamkin, etc.). And MS itself is not even understood to initiate *due* to this mechanism,

[37]In discussing Petitioner's success at establishing molecular mimicry as the mechanism in question, *I am not requiring* they offer such a mechanism as part of their case in chief. It is often noted that petitioners can prevail without a "detailed medical and scientific exposition on the biological mechanisms" of how a vaccine could have caused an injury. *Knudsen,* 35 F.3d at 548-49. Petitioners are never *obligated* to offer as part of their evidentiary showing proof specific to mechanism. Yet *when petitioners do just that*—where their experts discuss at length a mechanism, and cite items of evidence to substantiate it—it cannot be in error for a special master to weigh their success in so attempting. *Bender v. Sec'y of Health & Hum. Servs.*, No. 11-693V, 2018 WL 3679637, at *28 (Fed. Cl. Spec. Mstr. July 2, 2018). Because Dr. Tornatore discusses a mechanism in this case, Petitioner cannot shield this aspect of his opinion from scrutiny by arguing "petitioners don't have to prove mechanism at all."

differentiating it from other autoimmune neuroinflammatory diseases (like GBS) that *are* thought to have molecular mimicry as their likely pathogenic mechanism. The evidence offered does not reliably support the conclusion that receipt of a flu vaccine will likely cause the production of autoantibodies capable of worsening MS—the core element of any causation theory relying on molecular mimicry.

*Petitioner's Theory Assumes Evidence Specific to Vaccine-Caused Myelitis Applies Equally to MS*

As already noted, even though Petitioner accepts that MS was her ultimate diagnosis, she hopes to rely on evidence that is specific to one form of TM in order to prevail. But such evidence loses much of its probative value when transposed into the context of MS.

First, Dr. Tornatore unpersuasively frames record evidence of Petitioner's presentation as if it *were* TM, or that the spinal cord association of Petitioner's earliest symptoms (and lack of immediate evidence that it was in fact something bigger) was especially meaningful—that somehow MS is more likely vaccine-associated if it "begins" with TM. Thus, he stresses Petitioner's monocytosis test results, or presentation of night sweats and fever, along with the very fact that the first major issues Petitioner had were spinal cord-oriented, as suggestive of a pathogenic process different from what would otherwise characterize MS, and establishing that receipt of the flu vaccine was causing almost secondary issues impacting the cord. But literature filed in this case does not suggest MS cannot "start" with spinal cord myelitis, and as already discussed it has not at all been shown that medical science considers TM, whatever its cause, to have the capacity to "evolve" into MS later (in which case initial presentation might matter more).[38]

Dr. Tornatore's contentions about the timing of the appearance of oligoclonal bands from Petitioner's CSF testing in the fall of 2019 were especially strained. The fact that testing did not immediately reveal this biomarker for CSF inflammation, he maintained, was significant, suggesting to him that peripheral inflammation due to vaccination (the same inflammation he felt was likely producing cord-specific harm) was driving Petitioner's symptoms—almost as if in tandem to her RIS, and worsening it in the process. But he relies on an article (Beseler) I have encountered before—and here, as in *Peterson,* I do not give this item of literature great weight, since it is somewhat hypothetical in proposing a relationship between CNS-generated oligoclonal bands and periphery-created immunoglobulins.

[38] Dr. Tornatore's contentions about the significance of LETM's association with vaccination were effectively rebutted by Dr. Brier's observation that Petitioner *did not* display lesions long enough to meet LETM's diagnostic requirements—and this argument was never responded to by Dr. Tornatore in his second report, nor were these record-based criticisms raised by Dr. Brier addressed in Petitioner's briefing.

More importantly, Beseler says nothing about the significance of a patient's delay in testing positive for oligoclonal bands. Dr. Tornatore merely *speculates* that MS could initially be driven by the kind of peripherally-instigated IgG that Beseler discusses, traveling into the CNS (and hence explaining why a person with MS might not test positive for the bands). Notably, however, although oligoclonal bands are a biomarker for MS, their absence does not rule the diagnosis out, "particularly early in the condition . . . ." A. Thompson et al., *Diagnosis of Multiple Sclerosis: 2017 Revisions of the McDonald Criteria,* 17 Lancet Neurol. 162, 165 (2018), filed as Ex. A-14 (ECF No. 62-15). While Petitioner did not immediately test positive for oligoclonal bands ("early" in her condition), this delay has not been preponderantly established to be medically important, or to have any causation relevance—and in any event, the diagnosis of MS is not challenged by Petitioner, further diminishing the significance of this initially-missing criteria. And she *did* test positive for oligoclonal bands by early December (and after declining an earlier CSF re-test more than one month before). Ex. 10 at 39–40, 523.

Second, Dr. Tornatore invokes medical literature associating TM with vaccination. But although I do not categorically reject application of such evidence in this case, it loses some of its heft when applied to a distinguishable disease process, and therefore needed to be bulwarked with proof *specific to MS* and its suspected etiologies or instigating factors. That proof is lacking in this case—and no evidence stands for the proposition that vaccine-caused TM can morph into MS. It becomes especially difficult to give significant weight to evidence suggesting a one-time environmental stimuli (whether infection or a vaccine) could spark spinal cord myelitis when confronting a disease process that is *agreed* in this case to have predated vaccination, and which also lacks the same known possible externally-induced inflammatory process as its trigger.

At bottom, while reliable evidence may suggest that monophasic and isolated cases of TM *can* be vaccine-caused, it has not been shown that this association merits much evidentiary weight when what looks like acute TM turns out to be the first symptom of a larger disease process that was already underway.

*The Concept of Uhthoff's Phenomena Underscores Why Petitioner's Overall Theory is Unpersuasive*

Petitioner has demonstrated that MS patients can experience a recurrence of symptoms when overheated—Uhthoff's Phenomenon. And there is some evidence (albeit not robust—and certainly not shown to have been followed up upon any time in past 20 years or more) that occasionally a person's MS could worsen overall after a single "heating" experience. *See, e.g.*, Berger at 1750–51. At the same time, however, it appears Uhthoff's Phenomenon is recognized broadly and most often (a highly relevant consideration when evaluating evidence under a "more likely than not" test) by the medical community to be a *transient occurrence that subsides not long after*. *See, e.g.*, *Rodriguez v. Sec'y of Health & Hum. Servs.*, No. 99-307V, 2009 WL 3824733, at

*15 (Fed. Cl. Spec. Mstr. Oct. 30, 2009) (summarizing Dr. Tornatore's testimony in that case on the topic of Uhthoff's Phenomenon, that "[w]hen the core body temperature gets warm, the demyelinated nerves will not conduct electricity as well, and *you get transient symptoms until you cool down*") (emphasis added). Moreover, as Dr. Brier established, Uhthoff's Phenomenon typically occurs in the *absence* of new demyelination—not the case here, since Petitioner's initial imaging showed the presence of enhancing (meaning recent) lesions as well as older ones. Brier Rep. at 5, 6. And Berger involved *diagnosed* MS, not RIS or a subclinical, unknown process. Thus, while Dr. Tornatore's analogy of vaccine-associated transient symptoms (fever, fatigue, etc.) to the kind of factors that can spark Uhthoff's phenomenon had logic to it, it has not also been shown that these kinds of one-time environmental stimuli likely *worsen* MS (And hence that vaccines could analogously do the same).

Dr. Tornatore's invocation of Uhthoff's Phenomenon in some ways underscores the low likelihood that a vaccine could aggravate subclinical MS into something with outward, debilitating symptoms. It is well accepted that vaccines can produce *transient* malaise-like symptoms (fever, aches and discomfort), and that these symptoms are attributable to vaccine-associated cytokine upregulation and temporary inflammation.[39] *Lind v. Sec'y of Health & Hum. Servs.*, No. 22-1016V, 2026 WL 753086, at *18 (Fed. Cl. Spec. Mstr. Feb. 17, 2026) (acknowledging "the mere fact that vaccines encourage transient cytokine production, cause feelings of malaise, or simply stimulate the immune systems (albeit in a targeted and limited manner) [but that] does not elevate the vaccine into the likely driver of a longer-term disease"). But this process usually is not persistent, and only rarely is found to be associated with a subsequent, more significant injury (for example, in the context of infantile febrile seizures). *Fuller v. Sec'y of Health & Hum Servs.*, No. 15-1470V, 2019 WL 7576382, at *16 (Fed. Cl. Spec. Mstr. Dec. 17, 2019). Even where an individual experiences a vaccine-induced fever and *then* goes on to develop an autoimmune disease, that facial association does not always lead to a finding of causation. And here, direct evidence marshaled by Respondent demonstrates it unlikely that vaccination worsens MS in any event. Baxter at 1461. Thus, while it is *plausible* that a vaccine could promote an Uhthoff's Phenomenon-like effect, this is not sufficient to conclude vaccination likely worsens MS.

*Dr. Tornatore Relies on Oft-Reviewed Items of Scientific/Medical Literature That Do Not Preponderantly Support an MS-Flu Vaccine Relationship*

As noted above, Dr. Tornatore's expert reports referenced many of the same items of literature I have reviewed in prior similar cases, like *Peterson*. Those items did not become more persuasive on a second or third encounter.

[39] Notably, the record in this case reveals *no* such malaise-like post-vaccination complaints by Petitioner anywhere within ten days of her receipt of the flu vaccine on September, 25, 2019—so if a vaccine could provoke Uhthoff's Phenomenon sufficient to worsen preclinical MS, why did it take so long for this to occur for Petitioner? The literature on the subject supports a more instantaneous response to heating. *See, e.g.*, Berger at 1752.

For example, Dr. Tornatore's first report spends several pages extolling the value of Bielekova in substantiating his theory. *See generally* First Tornatore Rep. at 17–20. But this is an article I have reviewed twice before in other MS cases (one of which, *Peterson,* also featured Dr. Tornatore as an expert) but found unpersuasive, for the same reasons I discuss above. *See, e.g.*, *Peterson* at *29; *Pek* at *18. Similarly, I have in prior matters also reviewed Markovic-Plese, the Marmoset Paper, Beseler, the 2012 IOM Report, Nachamkin, and Rowhani-Rahbar. *See,* e.g., *Caruso v. Sec'y of Health & Hum. Servs.*, No. 15-200V, 2017 WL 5381154, at *17 (Fed. Cl. Spec. Mstr. Oct. 18, 2017); *Inamdar v. Sec'y of Health & Hum. Servs.*, No. 15-1173V, 2019 WL 1160341, at *18 (Fed. Cl. Spec. Mstr. Feb. 8, 2019).

In highlighting this fact, I do not mean to say that the articles in question are irrelevant, individually unreliable, or would never warrant probative value in other contexts. Rather, I am underscoring that I know well what they stand for—especially here, when they are offered to substantiate a claim a vaccine could worsen MS. But I have not found they appreciably aid Petitioner's argument (as discussed at length above)—since they were offered to make the same kind of contentions in prior matters that did not result in entitlement findings. They have not gained persuasive strength through fact of repetition. And nothing more recently published has been offered that would extend the findings of these articles, or show why contentions within them that were previously lacking in scientific corroboration have since been substantiated.

*Dr. Tornatore's Opinion was not Persuasive*

This is far from the first time Dr. Tornatore has offered an opinion that MS could be caused or worsened by a covered vaccine. He was the expert in *W.C.;* the expert in *Peterson;* and has offered a comparable opinion in other matters involving MS. *See, e.g.*, *Maciel,* 2018 WL 6259230, at *24–28 (HPV vaccine and MS causation/worsening). His opinion was not accepted in any of these decisions. And (as my repeated invocation of *Peterson* should establish), the overall structure and content of the opinion fashioned for this case is not all that distinguishable from what he has presented previously.

My recent determination in *Peterson* involved consideration of a theory highly comparable to what is offered in this case, even though this matter involves significant aggravation. It was conceivable that Dr. Tornatore might have been able to invoke new research or medical findings in this matter that would call into doubt prior, negative reactions to his theory. But this has not happened. Nothing about the theory as advanced in this case is all that different from what Dr. Tornatore has proposed before, and he relies on no "new" medical or scientific findings that call for reconsideration of my conclusions about the strength of the theory.

I have had the occasion to hear testimony from Dr. Tornatore, and review his expert written opinions, many times. He is a well-qualified neurologic/immunologic expert, and I have often

deemed his opinions not only helpful but useful to claimants in establishing causation.[40] But I am not compelled to accept the *ipse dixit* of any expert's opinion, regardless of their credentials and professional capacity to testify in a Vaccine Act case. Despite his qualifications, the opinion Dr. Tornatore prepared in this matter is one I have seen, and rejected, too many times at this point to find it crosses the line to preponderance, and it was not otherwise supplemented with new scientific or medical evidence. By contrast, Dr. Brier's opinion was succinct, direct, and more credibly recognized the overall lack of support for the idea that a vaccine could worsen MS.

*This Decision Reasonably Takes into Account Prior Decisions Involving MS*

This is far from the first time I have considered a theory that the flu vaccine can cause, or worsen, MS. And the theory offered in this case closely mirrors theories I have rejected before as not preponderantly-established. Under such circumstances, it is wholly reasonable for me to look to those decisions in helping reach an outcome herein. *Eberline*, 2026 WL 1746434, at *17–19. Special masters are expected to rely on their accumulated experience in deciding cases, in order to ensure the Program efficiently and expeditiously resolves claims. This means both encouraging settlement of cases that appear meritorious, based on prior experience with comparable facts and theories, as well as promptly denying entitlement in cases involving oft-rejected causation theories. I properly am guided by my knowledge of theories involving vaccine causation and MS in rejecting the theory proposed in this matter.

*Petitioner Did not Ultimately Carry her Preponderant Burden of Proof*

Petitioner filed two lengthy reports from Dr. Tornatore, a well-credentialed neurologist-immunologist. And those reports were accompanied by numerous items of medical literature, which themselves raise any number of clearly-relevant scientific points about the immune system and CNS demyelinating diseases. But the individual items of proof—no matter how specifically reliable they may be—do not add up *overall* to a theory that allows for the conclusion that "more likely than not" the flu vaccine can exacerbate MS. I reach this conclusion after weighing evidence offered by the Petitioner against Respondent's efforts, while also analyzing what weight individual items of evidence merit, and reasonably taking into account what I have learned from other cases involving MS as the injury. My conclusion does not call for proof of scientific certainty; even though I find it *unlikely* based on the existing record that the flu vaccine could worsen MS, this leaves room for some doubt (just as evidence deemed to preponderate in favor of the "can cause" prong might only barely outweigh evidence against that conclusion). That is an inherent feature of any evidentiary test involving preponderance—and it is erroneous to suggest that a finding that preponderance was not met hides a demand for certainty.

[40] *See, e.g.*, *M.K.S. v. Sec'y of Health & Hum. Servs.*, No. 21-1018V, 2026 WL 538419, at *22 (Fed. Cl. Spec. Mstr. Jan. 29, 2026) (petitioner successfully established his MOGAD to have likely been vaccine-caused).

C. Petitioner did Not Preponderantly Establish that the Flu Vaccine Likely Did Worsen her MS (*Loving* Prong Five/*Althen* Prong Two)

Petitioner's MS ceased to be subclinical in the month after her September 2019 vaccination. But beyond that temporal association, the record does not substantiate a *worsening* of her course, which was otherwise consistent with would be seen in any individual struggling with MS. Although such a diagnosis is exceedingly unfortunate (and Petitioner deserves great sympathy for having to bear it), I cannot conclude from the evidence in this case that her MS worsened - unless worsening is defined down to mean simply "appeared clinically post-vaccination." Not only would this render significant aggravation a nullity, but it would require a highly speculative determination that Petitioner's MS would *not* likely manifested at all but for vaccination, something that Dr. Tornatore's opinions do not come close to substantiating. And importantly, no contemporaneous treaters opined that the flu vaccine was associated with Petitioner's subsequent course.

Respondent had the better of this argument. As literature filed by Dr. Brier established, individuals who have RIS often (almost half the time to be precise) go on to develop MS *regardless* of what treatment efforts are made to arrest the pathogenic disease process. *See, e.g.*, Lebrun-Frénay; Okuda; Preziosa. This suggests that RIS will usually develop into clinical MS (or not) *independent* of environmental factors, pro or con—making it impossible to predict the impact of an intervening vaccination. The very existence of a person's RIS implies *on its own* a high likelihood to develop MS later. The record supports the conclusion that Petitioner's MS was likely to manifest regardless of her receipt of the flu vaccine before the clinical diagnosis could be made. The flu vaccine has not been shown in this case to have impacted that disease progression – and it cannot credibly be blamed for what transpired after its administration.

## III. Dismissal on the Papers was Appropriate

As noted, I am (appropriately) drawing upon my expertise ruling on comparable claims involving the flu vaccine and its capacity to cause or worsen MS. In such similar matters, I have heard live testimony on the question and/or reviewed lengthy expert reports. I therefore have sufficient familiarity with the subject to not require live testimony to understand Petitioner's theory and Respondent's objections to it.

Moreover, special masters are empowered to determine how best to resolve a claim, and in what manner—including whether to allow discovery at all. Section 12(d)(3)(B)("[t]here may be no discovery in a proceeding on a petition other than the discovery required by the special master"); *Kreizenbeck*, 945 F.3d at 1363. Matters do not run on automatic pilot, with claimants setting the terms for what discovery and evidence will be permitted, and/or how long the process to generate those materials will take.

This case involved a causation theory that I have evaluated repeatedly before, in matters where I was required to exhaustively review medical and scientific evidence on questions of causation. I considered a highly-similar theory offered by Dr. Tornatore one year ago, in *Peterson*. I also have been provided no grounds (in the form of new medical or scientific discoveries demonstrating that an initial, vaccine-caused MS flare, first manifesting as TM, *in turn* is likely casual of MS, or that vaccines likely worsen MS) for revisiting my prior conclusions. My determination was therefore appropriately reached on the basis of the filed record and the parties' expert reports and written submissions.

## CONCLUSION

In dismissing the case without engaging in expert discovery, I had hoped to avoid unnecessary, time-consuming additional proceedings, since my past experience with this kind of claim suggested to me that it would not likely succeed. I reached that conclusion only after repeatedly grappling over the past several years with comparable arguments about the relationship between MS and vaccines.

Petitioner was able to make a persuasive argument on review that expert input was required in light of fairness considerations, and thus reports were filed, and I have reviewed them in detail. The Remand Order nevertheless allowed for the possibility that the outcome of this case might be the same as before. Remand Order at 23. This prediction has proven correct. Petitioner has not established entitlement to an award of damages, and I must therefore **DISMISS** the claim. In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[41]

**IT IS SO ORDERED.**

/s/Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

[41] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.